71 So.2d 625 (1954)
FRUGE
v.
PACIFIC EMPLOYERS INS. CO.
No. 3798.
Court of Appeal of Louisiana, First Circuit.
March 22, 1954.
Rehearing Denied April 26, 1954.
Writ of Certiorari Granted May 31, 1954.
*626 Tate & Fusilier, Ville Platte, for appellant.
Taylor, Porter, Brooks, Fuller & Phillips, Baton Rouge, for appellee.
LOTTINGER, Judge.
This is a workmen's compensation suit wherein the plaintiff seeks to recover benefits as for total permanent disability. The occurrence of the accident, the hazardous nature of his employment and of his employer's business and his rate of pay at the time of the accident are all admitted. The sole question for determination centers around the extent and duration of the disability sustained as a result of the accident in question. The trial judge has favored us with written reasons for judgment which we herewith set forth in full:
"I have found difficulty in determining whether this plaintiff is partially disabled or totally disabled when his present condition as described by the medical experts and evidence are considered in the light of judicial discussions in the application of the respective provisions of the workmen's compensation statute of this State. My findings of fact by the evidence are mainly that the plaintiff is forty-one years old with no literary education. He attended school only to the third grade, but cannot now read or write and he neither speaks nor understands the English language. He testified in this case through the aid of an interpreter. He is a native of the Village of Chatagnier and for the past seventeen years has been a resident of Ville Platte, Evangeline Parish, Louisiana. Originally he was a tenant farmer. He quit farming about eight years ago and got work by the day at all sorts of jobs. He learned carpentry and painting from his father and they together built some small houses and did repair and maintenance work for several years. He made 35 to 40 dollars per week at this work. He next went to work for a Mr. Tate as a carpenter and painter and working in a cotton-seed oil mill and doing all sorts of work for this employer for about two years. The testimony has not been transcribed and I don't recall what pay he received from Mr. Tate in that period. While working for Mr. Tate this plaintiff hurt his back and drew compensation for more than a year after which he was paid a settlement of $650.00. He then went to work for his father at the same work they were doing before he took the job with Mr. Tatecarpentering, painting and so forth. After five or six months of this employment plaintiff's friend, Vige, gave him a job working in an oil well drilling crew. They worked on five or six different well drilling projects during the nine or ten months prior to June 24, 1951, when plaintiff suffered an accidental injury. Plaintiff suffered an accidental injury. Plainthese drilling crews. Most of plaintiff's work was handling 1¼ to 1½ inch pipe which was 31 to 32 feet long. Plaintiff used various tools on the drilling rig, including wrenches to screw the joints of pipe together. He also carried sacks of dirt which he dumped into a tank for making mud to be used in the drilling process. Plaintiff didn't know how to operate the mud machine and the driller each time told the plaintiff when to dump the dirt and how many sacks to put in. Most of plaintiff's *627 work was performed on the ground, but when something broke sometimes he was required to climb up the rig to assist in fixing whatever was needed.
"Further, on June 24, 1951, while working for the Williams Drilling Company, near Crowley, Louisiana, plaintiff was handling some pipe when a joint of the pipe accidentally fell on the top of plaintiff's right foot causing fracture of the tibia and fibula at the ankle. On that day following the accident plaintiff was admitted to Acadia Hospital at Crowley where X-rays were made, the fractures reduced and cast applied, according to the written report of Dr. J. W. Faulk. Dr. Faulk also reported that the plaintiff would need further treatment for two or three months.
"This case was tried on July 3, 1953. The plaintiff claims to be totally disabled to do work of any reasonable character. He prays for the maximum compensation, medical expenses, penalties and attorney's fees.
"I find further that, according to plaintiff's own testimony, for several months prior to the trial of the case, the plaintiff worked for a plumber named Smith. Plaintiff testified that he could not bear heavy continuous weight on his injured foot and that his work with the plumber consisted mainly of threading pipe and other shop work and spading dirt to backfill ditches. He was asked how he shoved the spade into the dirt. He first answered he used his right foot to push the spade into the dirt and then changed his statement to say that he did not use his foot at all because the dirt was soft. He did not work all day every day for the plumber. He went to work at 8:00 in the morning and always quit at 12:00 and rested some of the time. Plaintiff states that at this work he earned six to eight dollars per week. Plaintiff supplemented this work in the afternoons and on off days as a card dealer in a saloon for which he was paid one-fourth of the house cut on each deal of the cards, or a total of about $12.00 per week. In addition to these jobs with the plumber and the saloon he also spaded and plowed his own garden and mowed his yard with a push machine at various times. Plaintiff says he desires to continue the rest of his life as a roughneck in the oil drilling business, but he has not asked his friend, Vige, to give him any work since the accident because he doesn't think he can stand on his feet all day without pain in his ankle and big toe. Plaintiff stated that he has not attempted to climb any ladders since the accident except short ones and said "I do not believe I could climb too high'. He further testified he did not know how to drive an automobile and the only kinds of work he knows how to do are painting, carpentering, roughnecking and shop work.
"Referring now to the medical testimony, the only injury revealed by the X-rays taken on the day of the accident according to the report of Dr. Faulk was the fracture of the tibia and fibula at the right ankle joint. It is to be presumed that Dr. Faulk based his estimate of two or three months as the time needed for further treatment upon the type of fracture of these bones. His estimate as to the fracture was not far wrong because the testimony of Dr. Bannerman shows that the fractures were almost entirely healed in November, of 1951.
"On October 15, 1951, Dr. James Gilly, an orthopedic surgeon of Lafayette, Louisiana, had another X-ray made and made examination of the plates and of the plaintiff. Dr. Gilly reported, as did Dr. Romagosa, the radiologist who made the X-ray at that time, that the fracture of the lateral and medial malleoli of the left (this must be a typographical error as it was plaintiff's right ankle which was injured) ankle were in good position and alignment and that these fractures were healed to the extent that plaintiff should be able to walk without pain. Darland's medical Dictionary defines the term `lateralmalleolus' as `the process at the outer side of the lower end of the fibula' and the term `medial malleolus' as `the process at the inner side of the lower end of the tibia'. Therefore, it appears that Dr. Faulk, Dr. Gilly and Dr. Romagosa were referring to the *628 same bones. Dr. Gilly found there was marked edema of the lower extremity which pitted on pressure from the dorsum of the foot at the level of the knee joint; that the plaintiff walked on the outer side of his foot which was restricted in its outward rotation; that there is a Sudecks atrophy of the bone, which the doctor explains as a vascular disturbance causing decalcification from the bones unlike the uniform decalcification following disuse or immobilization in plaster. This condition evidently cleared up because Dr. Bannerman reported that his X-rays on March 4, 1953, were entirely negative. Dr. Caldwell finds the bones of the foot to be of normal texture. Dr. Gilly at this time, October 15, 1951, found that the plaintiff had a valid complaint and was unable to work.
"This doctor recommended certain type of treatment, but there is no evidence that his recommendation was carried out. On March 20, 1952, plaintiff was examined by Dr. Guy A. Caldwell, of Oschner Clinic, New Orleans, who made this diagnosis: `Traumatic arthritis of the ankle and midtarsal joints, chronic'. I quote further from his written report as follows:
"`Treatment: Advise hospitalization and physical therapy under controlled conditions and with shoe corrections as required.
"`Opinion: The patient has objective evidence of persisting disability of the foot and ankle. There is gross swelling and deformity. The X-ray examination reveals no fracture or displacement of the bones, but physicial examination shows unquestioned inflamation of the soft parts in and about the ankle joint and midtarsal joints. The reason for the persisting disability and swelling is not clear. However, it seems probable that the swelling and discomfort could be overcome by controlled physical therapy exercise and corrected shoes. It would be absolutely necessary to have the patient under supervision in the hospital for approximately a month in order to make any headway. I would estimate that approximately three months would be required to restore him to a duty status, but can see no reason for permanent disability.
"`The patient has not reached the stage of maximum improvement and is still disabled for manual labor as a result of traumatic arthritis brought on by the injury. It is probable that he can be completely relieved in approximately three months by treatment as outlined.'
"Dr. Caldwell and Dr. Harry D. Morris, also of Oschner Clinic, further examined and treated the plaintiff on June 2; June 20; July 22; August 7; August 21; September 4 and September 24, 1952. Both of these doctors testified out of Court under oral interrogatories, which depositions are in the record.
"Between the dates of June 2 and June 20, 1952, the plaintiff remained in Foundation Hospital under the personal treatment and observations of Doctors Caldwell and Morris. There was some improvement during that period and he was instructed to carry on at his home the exercise and treatment which they prescribed. When he was seen by these doctors in July and August it was thought that he was better, but not completely relieved. Their final examination and X-rays made on September 24, 1952, revealed that the subjective complaints were still present. The swelling around the ankle had disappeared and there was good range of motion. There was still tenderness around the big toe joint. These doctors had previously reported that the X-rays they made showed no evidence of fracture or dislocation. From this I assume that plaintiff's ankle had completely recovered and there remained tenderness and slight swelling at the big toe joint, which gave some pain after considerable walking at the doctors' direction. The bones were normal in texture throughout the foot. On this last visit they found what the radiologist calls a `minimal hypertrophic arthritis about the first medial phalangeal joint'. At that time these doctors did not think the plaintiff could do heavy manual labor all day every day. The only noticeable result of exercise and walking which they required him to do was slight increased tenderness in the toe joint. Dr. Caldwell testified that they had him do a good deal of walking and exercise and then observed his foot immediately *629 afterwards and on the next day thereafter and they `were never able to see that such exercise and activity actually aggravated his condition; it did not create additional swelling or redness or limited movement'. The final conclusion of these doctors on September 24, 1952, was that the disability was referrable and confined to the foot and amounted to fifteen to twenty per cent of usefulness of the foot.
"Dr. Caldwell described the plaintiff as a phlegmatic type of person who made no great to do over his condition, and that if he had more of a will to do something it is quite possible that his ability to work might be increased. They thought, however, that his complaint seemed to be consistent, but a little too much for the amount of trouble they could observe. Even at that early date, Dr. Caldwell thought that `as far as permanent effects or damaging his foot, it would be just as well for him to exercise and be on his foot with protection as it would be to sit around and do nothing'.
"Dr. Morris generally agreed with Dr. Caldwell in his testimony. However, Dr. Morris expressed the opinion that the plaintiff would improve with time and with use of his foot and he said, "I do not think he had enough disability that, under ordinary circumstances, he could not go ahead and do the majority of things that people do in the ordinary run of events'. Both Dr. Caldwell and Dr. Morris believed that he would have some difficulty in doing heavy work the full eight hours a day every day and, as I understand it, their estimate of fifteen to twenty per cent disability is given to compensate for that loss of use of his foot and for the possible resulting pain which full use and heavy work may cause.
"On November 21, 1951, plaintiff was examined by Dr. Moss M. Bannerman of Baton Rouge, Louisiana, an orthopedic specialist who also made X-rays at that time. Dr. Bannerman found tenderness between the lateral malleolus and tibia. Dorsiflexion of the foot produced pain. The calf of the right leg was three-quarters of an inch smaller than that of the left and strength appeared to be about fifty per cent of normal, with slight swelling over the dorsum of the foot. The fractures were practically healed. Dr. Bannerman entertained the impression that there were possible arthritic changes in the tibio-fibular joint. He prescribed strenuous physiotherapy and the use of a wedge under the medial side of the shoe. His written report further said that if these measures do not give considerable relief in four or six weeks, he thought exploration and fusion of the tibiofibular joint were indicated to relieve pain.
"Dr. Bannerman examined plaintiff again on March 4, 1953, and at that time he found no essential change and no progress as compared to plaintiff's condition on November 21, 1951, a lapse of over fifteen months. X-rays on that occasion were entirely negative. Dr. Bannerman further commented in his report that exploration of the joint with the idea of repair or fusion of the joint might restore him to complete usefulness. There is no evidence that this operation was performed.
"On June 12, 1953, Dr. Bannerman examined plaintiff again and still found evidence of pain in the ankle, but thought that there was considerable improvement generally over plaintiff's condition in March. Muscular atrophy previously noted in the calf of the right leg was considerably improved which indicated that plaintiff had been walking fairly well. The swelling of the ankle joint had subsided, but at this time there was noted swelling about the big toe joint of the right foot. Plaintiff was wearing a mid-tarsal bar and Dr. Bannerman recommended continued use of this bar with increased activity to see if the swelling returned to the ankle. If it did not so return he thought the plaintiff would go on to complete recovery without additional surgery. This hope was confirmed by the fact that the increased work and activity, which plaintiff explained he engaged in some weeks prior to the trial of the case, were followed by the disappearance of swelling in the ankle, increased muscle measurement of the calf of the right leg and without pain increase or swelling at the toe joint.
"Dr. Bannerman testified on the trial of the case in the main by giving a general *630 summary of the written reports which are also part of the record. The Doctor made an examination of the plaintiff's foot in Court on the day of the trial and testified he could not find any difference over plaintiff's condition as of the last examination on June 12, 1953, which was a lapse of only a few days. He thought that the plaintiff's increased activity had not made the foot any worse and in fact he fixes the extent of plaintiff's disability of the foot at that time at ten per cent. This doctor said that by continued use of the shoe correction and contrast baths the plaintiff has a good possibility of recovering complete use of his limb. The doctor suggested that his shoe be repaired, his activity increaseddo more walking and more strenuous physical activity and gradually increase the same providing the pain remains the same or becomes less. He thought plaintiff should be re-examined in three or four weeks after that date. This doctor thought at that time that plaintiff should be qualified to do more strenuous work than he was doing. The diagnosis of traumatic arthritis would be difficult to dispute, said Dr. Bannerman, and it is possible that the injury may have aggravated bony changes already taking place. Dr. Bannerman has not attached too much significance to the big toe condition, but he cannot dispute an aggravation of arthritic condition in that big toe joint. He doesn't feel that the changes in the big toe joint shown by the X-rays are the cause of his disability at this time, while Doctors Caldwell and Morris think that arthritis in the big toe joint is the sole cause of plaintiff's trouble. Dr. Bannerman said it was his opinion that on his initial examination and also in March of 1953 that plaintiff could not perform strenuous duties. He found his condition so improved on his examination in June, 1953, that he recommended increase in activity. This doctor suggests now that it will be two to four months from the date of the trial before plaintiff will be completely well. I do not feel that based alone on Dr. Bannerman's prognosis of two to four months for complete recovery that the Court would be warranted in fixing a date to terminate payment of compensation at such time. The compensation law gives the right of review of a plaintiff's condition every six months and, therefore, both parties are protected by allowing compensation as hereinafter fixed during disability for the maximum time.
"The plaintiff was the only lay witness and it is my interpretation of his testimony that as a worker in drilling oil wells he could be classed as nothing more than a common laborer. He served no time of training when he was given the job and though he has worked regularly for nine or ten months on this job he cannot yet drive an automobile and cannot operate the machine which makes the mud used in the drilling process, and in fact he stated that he did what he was told to do by the driller. The plaintiff classed himself as a roughneck on this job. I don't know the full duties of a roughneck in drilling oil wells, but from plaintiff's testimony, I would class him more of a roustabout. Certainly he is nothing more than a laborer.
"When plaintiff received the injury it is my opinion he was totally disabled at least up to September 24, 1952, when Dr. Caldwell and Dr. Morris testified that he was able to do a majority of his duties except heavy labor all day every day. The purpose of fixing the amount of disability at twenty per cent is to compensate for the pain and part-time non-use of his foot. Dr. Bannerman has also earlier fixed the disability at fifteen to twenty per cent and on the day of the trial Dr. Bannerman estimated the amount of plaintiff's disability of his foot at only ten per cent. It is my opinion that plaintiff was totally disabled from the date of the accident on June 24, 1951, to June 12, 1953, when Dr. Bannerman last made his examination and found a decided improvement over plaintiff's previous condition; that after June 12, 1953, plaintiff's disability should be rated at twenty per cent loss of usefulness of the foot and paid compensation accordingly during disability not exceeding 300 weeks from the date of the accidental injury.
"Dr. Caldwell gave that appraisement in September, 1952, and in order to be entirely fair to the plaintiff I adopted that rate as *631 of June 12, 1953, because I think Dr. Bannerman's rate of ten per cent disability as of that date is too low. There is every indication from the testimony that plaintiff's improved condition is the result of increased activity and use of the foot in these last several months. I feel that full justice will be done by the award which I have made herein.
"Counsel for plaintiff relies on the line of cases cited in Strother v. Standard Accident Insurance Company, La.App., 63 So. 2d 484, and others. Most of these cases involve skilled workmen. I think no useful purpose will be served by endeavoring to analyse these cases in the light of the facts in this case because each case must stand on its own facts and the law applicable thereto.
"Plaintiff was earning $90 per week at the time of the accident. There is evidence indicating that lately the plaintiff has earned approximately $8 per week spading dirt and $12 per week dealing cards. It is not shown clearly whether the two amounts were earned in the same week. Be that as it may, I do not feel that this evidence presents the full facts as to what this plaintiff is `able to earn' because the plaintiff plowed and spaded his own garden, mowed his yard and said that he had only had to climb short ladders, indicating he had been working as a carpenter and/or painter. There is not sufficient evidence to establish with any degree of certainty to what extent the earning capacity of the plaintiff has been reduced and therefore, it must be accepted that the percentage of reduction in ability to earn wages was the same as the percentage of physical disability. The amount of the award after June 12, 1953, is arrived at by taking sixty-five per cent of twenty per cent of $90, which is $11.70 to which the plaintiff is entitled from June 12, 1953, during the period of his disability not exceeding 300 weeks from June 24, 1951. Morgan v. American Bitimuls Company, 217 La. 968, 47 So.2d 739; Brannon v. Zurich General Accident & Liability Insurance Company, La.App., 61 So.2d 257; Washington v. Holmes & Barnes, La.App., 4 So. 2d 51.
"The plaintiff is claiming penalties and attorneys fees under the authority of LSA-R.S. 22:658 and the case of Wright v. National Surety Corporation, 221 La. 486, 59 So.2d 695. Attorneys fees and penalties cannot be allowed in this case for the reason that the acts of defendant have been anything but `arbitrary, capricious or without probable cause'. Compensation in the maximum amount has been paid for 92 weeks and the defendant has given plaintiff reasonable consideration and assistance, as evidenced by the voluntary payment of medical bills amounting to $936.08, almost double the legal requirement. There were grounds for dispute of plaintiff's claims and as to what amount might be due him.
"The defendant seeks to have the sum of $436.08, being the amount over $500 paid for medical treatment, credited as an offset against any compensation award which a judgment may allow. This overpayment was voluntarily made without any specific advance agreement or understanding that the defendant would be entitled to such credit. This over-payment was gratuitous and this claim for credit will be denied. Delaney v. Fred Brenner Lumber Company, 154 La. 156, 97 So. 349; Hunt v. Magnolia Petroleum Company, La.App., 10 So.2d 109, and Kinder v. Lake Charles Harbor & Terminal District, La.App., 31 So.2d 498.
"There seems to be no objection to taxing as costs the expert witnesses fees of $50 for Dr. Caldwell, $50 for Dr. Morris and $48 as expense of taking the depositions. Dr. Bannerman testified as an expert witness and his fee will be fixed in the same amount and taxes as costs.
"For these reasons there will be judgment herein in favor of the plaintiff and against the defendant for compensation in the sum of $30 per week from June 24, 1951, to June 12, 1953, and for compensation in the further sum of $11.70 per week from June 12, 1953. During the period of disability not in excess of 300 weeks from June 24, 1951, subject to a credit of compensation payments for 92 weeks beginning June 24, 1951, together with legal interest from the date of maturity for such weekly payments as *632 remain unpaid and for all costs of this suit. The fees for Dr. Caldwell, Dr. Morris and Dr. Bannerman in the sum of $50 each and in the sum of $48 expense of taking depositions shall be taxed as costs. Judgment will be signed accordingly."
Following the rendition of a formal judgment in accordance with the views above set out, the plaintiff asked for and was granted a devolutive appeal wherein he seeks compensation for total permanent disability together with penalties and attorneys' fees for arbitrary refusal to pay compensation, all as originally prayed for. The defendant has acquiesced in the judgment of the court below.
A review of the record reflects that the factual findings of the trial judge are substantially correct. We believe, however, that he erred in his application of the law to these facts wherein he concluded that the plaintiff was only partially disabled subsequent to June 12, 1953.
The record shows that since the accident the plaintiff has been unable to perform labor without pain and that the only money he earned was as a result of his activities as a card dealer and the part-time work as a plumber's helper. From the former he averaged $12 per week, and from the latter 75 cents per hour for two or three hours work per day for about two days per week. It appears also that as a plumber's helper, he earned only a total of $6 one week and $8 the other week.
With further reference to his activities as a plumber's helper, the plaintiff stated that he didn't dig the ditches, but only "put the dirt back in", and that sometimes he would work in the shop "making threads on pipe". His testimony also reflects that he experienced pain as a result of this work and that every evening he had to bathe his foot in hot water and Epsom Salts.
In contrast to his duties as a plumber's helper, and those he performed prior to the accident, his testimony in this regard is as follows:
"Q. Now, as a roughneck will you tell some of the duties that you had to perform? A. Assemble pipes and other things. I had to climb way up on the derrick and fix things. I had to fill up sacks with dirt.
"Q. Did your job require you to be on your feet all day long? A. I had to stand up all the time.
"Q. Did your job require you to lift heavy objects such as pipes et cetera? A. Yes.
"Q. And would you say that the work you performed all day long was light or heavy work? A. Always heavy.
"Q. How many hours a day did you work? A. Eight hours.
"Q. How many days a week did you work on the job? A. Seven days.

* * * * * *
"Q. Describe in your own words the full duties of a roughneck in a drilling gang. A. I have to do all the driller asks me to do, making mud, fixing pipe to put down in the hole, screwing * * *
"Q. What do you mean by fixing pipe? A. Screwing them together, and we have to unscrew the pipe also, and if a piece breaks we have to fix them.
"Q. How do you fix them? A. We have to remove them. We don't have a shop. We have to replace it with other pipe.
"Q. You don't fix the pipe, you just put in a new piece, is that right? A. That's correct, we put in another piece.
"Q. Do you unload pipe from trucks? A. Yes, we unload the trucks when they come.
"Q. Do you unload pipe from barges? A. When we work on the water. That's where I got hurt.

* * * * * *
"Q. What tools or equipment do you yourself personally use while working *633 as roughneck? A. Big Stilson wrenches.
"Q. Anything else? A. We use so many other tools I cannot name them all.
"Q. Can you name just a few of them? A. Big hammers, and some slips to hold the pipes.
"Q. A slip is just a wedge to put down between the drill stem and the edge of the hole to keep it from sliding into the hole, isn't it? A. Just two big pieces of iron together and put there on the ground to hold the pipe.
"Q. And this big hammer and this big wrench that you used were just to screw the pieces of pipe together or apart on the floor of the rig, weren't they? A. It is to screw the tubes together and unscrew them.
"Q. And that was right there where the driller told you what to do, wasn't it?

* * * * * *
"Q. Now, with regard to those duties that you performed as a roughneck, did they require you to climb up and down the rig and to climb up and down the barge or other drilling stations? A. The rig was on the barge and I would have to go up and down, too.
"Q. You mean go up the rig? A. When something would break I had to go up the rig, of course, I was working down on the ground floor and unless something broke I did not have to go up.
"Q. Now, that pipe you used to handle, was that heavy pipe or light pipe? A. It was heavy.
"Q. Would you just give an idea of about how wide it was and about how long the pipe was? A. It was somewhere around 31 to 32 feet long and about one and one-half inches in diameter.
"Q. And there was more than one kind of pipe you used to use? A. It is the kind of pipe they use to drill.
"Q. Is the iron part of that pipe around the hole fairly thick? A. About one-fourth inch, I don't know exactly.
"Q. Now, Mr. Fruge, when you stopped carpentering and went to work as a roughneck why did you go to work as a roughneck instead of carpentering? A. Because I wanted to roughneck. I wanted to learn that.

* * * * * *
"Q. Now, when you worked as a roughneck were there any motors or machinery around the drilling? A. Yes.
"Q. What kind of machinery was that, in general? A. It was a machine that caused to make mud.
"Q. Did you have to know how to operate that machine? A. No, I did not know how.
"Q. When you were a roughneck on a drilling rig did you have to know your way around the drilling rig? A. Yes, I knew everything around the rig.
"Q. And did you have to know where the tools were and how to use the tools, the various types of tools on the drilling rig? A. Yes.
"Q. And did it take you some time to learn how to use those tools and where they were and how the crew operated? A. It took five or six weeks."
The trial judge, apparently impressed with the fact that the plaintiff could not drive an automobile nor operate the mud making machine used in the drilling process, concluded that he "was nothing more than a common laborer". While we agree that the record discloses that he could not perform all the duties incidental to operating a drilling rig, we are nonetheless impressed with the fact that the plaintiff did perform (and apparently satisfactorily) *634 all of the duties imposed upon him. Taking these duties as a whole we are unable to agree with the trial judge's conclusion that this man was "nothing more than a common laborer".
In the recent and well-known case of Wright v. National Surety Corp., 221 La. 486, 59 So.2d 695, the plaintiff, the operator of an asphalt distributor, was held by the Supreme Court to be totally and permanently disabled on the theory that though he could still drive a pickup truck, he could not, because of a weakened arm, operate the distributor mechanism, itself. The court distinguished the case of Morgan v. American Bitumuls Co., 217 La. 968, 47 So. 2d 739 (relied on by the trial judge in the instant case), and, as we understand the rationale of the opinion, declared that the criteria in cases of this sort is not simply whether the claimant is a skilled or common laborer, but whether he is disabled to do work of the same or similar description. The following language of the Supreme Court, found at 59 So.2d 697, is pertinent here:
"The question here, as in all these cases, is whether plaintiff is `disabled to do work of any reasonable character' within the intendment of the compensation statutethis is, as was stated in the Morgan case, `disability to perform work of the same or similar description, kind or character (not necessarily the identical position) to that which the claimant was accustomed to perform or was undertaking when the injury occurred.' See, also, the long list of authorities cited in that opinion.
"The facts of this case require an affirmative answer. Initially, it strikes us as self-evident that the operator of an asphalt distributor, which is a large mechanical device used in surfacing blacktop roads, is to be regarded as a skilled laborer. Albeit, we would hesitate to conclude, in the absence of authoritative opinion to the contrary, that an ordinary truck driver occupies the status of common laborer. But be this as it may, the question for decision is whether plaintiff can do work of a reasonable character." (Italics ours.)
We think the above expression decisive of the issue here. The work performed by plaintiff subsequent to the accident, i. e., dealing cards and assisting a plumber, in the light of his previous duties, we do not think to be work of a reasonable character within the meaning and intendment of our compensation statute and we therefore conclude that the plaintiff is totally and permanently disabled.
The remaining question concerns penalties and attorney fees. The record discloses that the defendant paid compensation from June 24, 1951 (the date of the accident) until January 1, 1952, when payments were discontinued. Suit was filed on April 9, 1952, and on May 22, 1952, payments were brought up to date and thereafter continued until March 30, 1953, when they were discontinued again.
At the time of discontinuance of payments on January 1, 1952, the defendant was in possession of the report of Dr. James Gilly, orthopedic specialist, dated October 18, 1951, which stated that "at the present time, I would state that the man has a valid complaint and is unable to work. As to the estimated period of disability, either with or without treatment, I am unable to state at this time." (Joint Exhibit "c".)
At the same time the defendant was in possession of the report of Dr. Moss Bannerman, dated November 21, 1951, which stated that "strength appears to be about 50 per cent of normal. There is slight swelling over dorsum of the feet. * * * (I recommend) the use of more strenuous physiotherapy and a wedge on the medial side of his shoe to take the strain off the lateral joint. In the event that these measures do not give a reasonable amount of relief over the next four to six months, it is felt that an exploration and fusion of the tibiofibular joint is indicated to relieve his pain." (Exhibit D-1.)
In addition to the above, the plaintiff was sent to Dr. Bannerman in March, 1953, at the request of counsel for the defendant *635 and we find in the record a report of Dr. Bannerman, addressed to counsel for the defendant, dated March 4, 1953, which we quote.
"I appreciate your returning Mr. Fruge to me for re-examination. He was previously seen by me in November, 1951. There has been according to him no improvement since the time last seen. He states that he has been through Oschner Clinic. Has been treated by Dr. Morris and Dr. Caldwell with considerable physiotherapy and numerous shoe corrections but that his foot still hurts him whenever he tries to do any kind of walking or when he tries to spade his gardening. He refers his pain as before to the joint between the lower tibia and fibula.
"On examination at this time there has been no essential change in Mr. Fruge's findings as compared to the examination thirteen months ago. The patient complains of tenderness over the lateral malleous, anteriorly, between it and the tibia. There is still approximately three-fourths of an inch difference in the size of the two calves and slight swelling noted over the area of tenderness.
"Repeat X-rays were made on this man's ankle and these X-rays as previously are entirely negative.
"Impression: Tibiofibular diastasis.
"Comment: This patient has made no progress over the past eighteen months since his injury and to my mind shows no particular change as compared to the last examination. It is my belief that he has an injury to the joint in view of his lack of improvement. Exploration is indicated with the idea of repair or fusion of the joint. It is felt that such a procedure has a good chance of restoring him to complete usefulness. On the basis of the present examination it is felt that he has a disability of approximately twenty percent of the use of the foot and that this is sufficient to prevent him from doing excessive walking. The above-mentioned procedure would require an estimated hospital cost of approximately Four Hundred and Fifty to Five Hundred and Fifty Dollars of which approximately half represents the surgical fee. Hospitalization for approximately five to ten days will be necessary with four or five X-rays before treatment is complete, and the wearing of a cast for about two and a half to three months. Return to work, if the operation is successful, should be accomplished within six months after the date of surgery, perhaps sooner."
It is significant to here remember that this report was received just 26 days prior to the time that plaintiff's compensation was discontinued for the second time on March 30, 1953. This report certainly shows without question that the plaintiff was still disabled to do any heavy manual labor or excessive walking.
In addition to the above, we must remember that the plaintiff was examined and received treatment at Ochsner Clinic in New Orleans, Louisiana, and was examined and treated by Drs. Caldwell and Morris, covering a period of several months. We find in the record the first report of Dr. Caldwell, dated March 20, 1952, of the plaintiff and this report was addressed to the insurance adjusters handling the claim for defendant, wherein they advised at that time that the patient had not reached the stage of maximum improvement and is still disabled for manual labor as a result of traumatic arthritis, brought on by the injury. We next find a report of Dr. Morris, dated October 30, 1952, addressed to the attorneys of defendant, which we quote:
"We have your letter of October 23 requesting a supplementary report on Cleven Fruge of Ville Platte, Louisiana. Dr. Caldwell and I reviewed this case and discussed at some length. We feel that the disability quoted in our last report on this patient is of permanent nature and since it has been a year and half since his injury we do *636 not expect improvement to take place. In addition to subjective complaints this patient does have objective evidence of disability consisting of valgus of the foot on weight bearing and tenderness about the great toe which causes the patient to walk on the outer side of his foot. I believe this patient could reutrn to work of a type that did not require an excessive amount of standing or walking and it is very problematical whether an appreciable amount of improvement in this patient's ability to work will result in the future. The disability quoted was based on the foot and not on the body as a whole."
This report certainly signifies that the plaintiff was still disabled to perform work of the same or similar description, kind or character to which the claimant was accustomed to perform or was undertaking when the injury occurred.
As a matter of fact we fail to find any evidence in the record which would have justified or given the defendant probable cause to discontinue the plaintiff's compensation on March 30, 1953. Under the circumstances, we do not see how the refusal to pay compensation could be construed as anything other than arbitrary, capricious or without probable cause, and consequently the holding of Wright v. National Surety Corporation, 221 La. 486, 59 So.2d 695, applies and we have no alternative but to assess penalties and attorney's fees in this case. We believe, however, from the facts and circumstances as found in this record that the penalties should begin on the date of March 30, 1953, which was the last time that plaintiff's compensation was discontinued. We are of the opinion, however, that when plaintiff's compensation was discontinued on January 1, 1952, that same at that time was discontinued arbitrarily and without probable cause but since the plaintiff was paid compensation after filing suit on April 9, 1952, and he received same without protest or without the understanding that he was still holding the defendant for the penalties, we are inclined to believe that he acquiesced in said payments and is not entitled to any penalty on the then overdue payments. We are inclined to believe, however, as stated hereinabove, that the plaintiff is entitled to penalties as provided in the Act on all overdue payments from March 30, 1953.
For the reasons assigned the judgment appealed from will be amended and it is now ordered that there be judgment in favor of the plaintiff, Cleven Fruge, and against the defendant, Pacific Employers Insurance Company, for compensation in the sum of $30 per week from June 24, 1951, during the period of disability, not to exceed 400 weeks with legal interest on each overdue payment from its due date until paid, subject, however, to a credit for compensation paid to date. It is further ordered that a penalty of 12% on all weekly compensation payments now due, or hereafter overdue for 60 days be and it is assessed against the defendant, together with an attorney's fee payable to the plaintiff in the sum of $500. All costs to be paid by the defendant.
Judgment amended and as amended affirmed.