LOTTINGER, Judge.
This is a suit under the Workmen’s Compensation Act of the State of Louisiana for death benefits by the surviving dependent widow of Clifton Holland for herself individually and for and on behalf of the three minor dependent step-children of deceased. Companion suit entitled Humphreys v. Marquette Casualty Company, 95 So.2d 872 was consolidated with this suit *879 for trial. After certain preliminary proceedings were disposed of the petitioners in the present suit were Mrs. Dula Marie Holland, individually and for and on behalf of her three minor children, Daniel Gene Stanley, Judy Faye Sensat, Paulette Gayle Sensat, and Mrs. Emey Holland, for and on behalf of her minor child, Leslie James Holland. Mrs. Dula Marie Holland was the surviving dependent widow of the deceased, whereas, Mrs. Emey Holland was a divorced wife of the deceased. The defendant Marquette Casualty Company was the compensation insurer of N. P. Martone, the operator of a rice farm, and American Casualty Company, the compensation insurer of Bon Air Ranch, a partnership which operated a cattle ranch.
The Lower Court rendered judgment in favor of Mrs. Dula Marie Holland and her three children, and against both insurance companies, in solido. The action by Mrs. Emey Holland, on behalf of her minor son was dismissed. Appeals have been taken by both insurance companies as well as Mrs. Emey Holland and Mrs. Dula Marie Holland.
The evidence shows that Bon Air Ranch was a partnership composed of Mrs. Zim W. Todd and her daughter, Mrs. Undine Todd Martone. It has been operated as a partnership since the death of Mr. Zim Todd in 1954. Prior to that time the ranch was operated as a sole proprietorship by Zim Todd. The ranch owned 670 acres of land, all of which was under lease to N. P. Martone as a rice farm. Bon Air Ranch was the lessee of an additional 15,000 acres of land from several lessors. Of the leased land, Bon Air subleased some of it to Mr. Martone as well as to others for rice farming.
The remainder of the leased land was used by Bon Air in its cattle raising activities. It might, therefore, be said that Bon Air Ranch was in the business of raising cattle as well as in the business of leasing and then subleasing land for rice farming.
Bon Air Ranch normally employed three “cowboys” to assist in its ranching activities. In addition thereto, Mr. Martone was the General Manager of the ranch, a position which he occupied without remuneration except for the satisfaction of assisting in the operation of the Bon Air Ranch, which was jointly owned by his wife and mother in law. Bon Air Ranch owned its own equipment, maintained its own payroll and other records, paid its own social security taxes, carried its own compensation insurance, and had its own cattle brand. At the time of the accident, the Bon Air Ranch owned some 1,800 head of cattle.
Mr. N. P. Martone was a rice farmer as well as a cattle rancher. He owned no real property. His business was conducted on property which he leased from others. Among the several lessors to Mr. Martone was the Bon Air Ranch. By far the greater portion of Mr. Martone’s business was rice farming. As a sideline, he owned some 300 head of cattle.
Mr. Martone ran his own business. He normally employed some six to eight employees. He owned his own equipment, kept his own payroll as well as other accounts, paid his own social security taxes, carried his own compensation insurance, and had his own cattle brand. His business was conducted on property which he leased from others for a certain percentage of the crop raised. He owned several rice bins which were situated on property leased him from Bon Air. Bon Air also owned three bins which were adjoining those of Mr. Martone.
The testimony reflects that the busiest time of year for cattle ranching is during the summer months. Rice farming, on the other hand, has its peak period during harvest season, which is during the rancher’s slack season. It was the custom in the area for the ranchers and farmers to swap labor, so as to help each other out during their busy season. This custom prevailed between Bon Air Ranch and *880 Mr. Martone. During harvest season Mr. Martone would use “cowboys” to assist his laborers in harvesting the rice crop. On the other hand, during the summer the ranch would use some of the farm hands to assist the “cowboys” in cleaning out ditches and repairing fences. The arrangement was merely a swap of time; the employee would be paid by his regular employer during the time he was assisting the other activity. Mr. Martone testified that he kept record of the “swapped” time in his head; that at the time of the accident the Bon Air Ranch owed him some time.
Although there was a close family relationship between the owners of the two businesses, and they cooperated one with the other, it appears that the businesses were separate and distinct entities. Loans were acquired by each in its own name; bank accounts and charge accounts with merchants were carried by each in its own name. Had it not been for the fact that they each had separate compensation insurers, this case possibly would not be before us.
The evidence discloses that on and for a few days prior to September 27, 195S, Mr. Martone was engaged in harvesting rice from land leased to him by Farmers Land and Canal Company. The rice was loaded on two trucks owned by Mr. Martone and transported a short distance away to a rice bin owned by Mr. Martone but situated on Bon Air Ranch. At the time, Mr. Martone had about seven regular employees on his payroll. As he needed two truck drivers and unloading helpers he told Clifton Holland and Joe Humphreys, who were both regularly employed as “cowboys” by Bon Air Ranch, to go to the fields and assist in harvesting his rice.
Holland and Humphreys had assisted in the harvesting for a few days prior to the accident. On the morning of September 27; 1955, prior to commencing the day’s harvesting activity, it was necessary to move a horizontal and vertical-auger from one bin to another bin. Holland and Humphreys assisted in moving the equipment, which came into contact with power lines resulting in the electrocution and death of both Holland and Humphreys.
Suits were filed by the surviving widows and alleged dependents of both Holland and Humphreys. Both suits were consolidated for trial, however, separate judgments were rendered. The facts are identical except for difference in the status of the dependents.
Holland’s widow, Mrs. Dula Marie Holland instituted suit against the defendant, Marquette Casualty Company, compensation insurer for N. P. Martone, for maximum compensation and benefits, maximum funeral expenses, and penalties, interest and attorney fees for herself and her three minor children who were stepchildren of Holland and who had been dependent on Holland for support. Subsequently, Leslie James Holland, a child by prior marriage and an alleged dependent of Holland, was joined as a petitioner through his mother Mrs. Emey Holland. Defendant, Marquette Insurance Company attempted to bring in the compensation insurer of Bon Air Ranch, American Casualty Company, via Third Party Pleadings. This attempt was rejected by the Lower Court. Subsequently, the petitioners amended their pleadings to bring in American Casualty Company as a code-fendant.
The main controversy is: Which insurance company is liable for compensation payments under the Workmen’s Compensation Act? The parties have agreed that employees of both N. P. Martone and Bon Air Ranch are engaged in hazardous occupations. They have agreed that the accident occurred and have agreed to about everything except as to who is liable for payment of compensation, and to whom is compensation payable.
The Lower Court evidently concluded that Holland and Plumphreys were working *881 for both Bon Air Ranch and N. P. Martone, as it held both insurance carriers liable for compensation. After rehearing it awarded judgment in favor of Mrs. Dula Marie Holland, and against defendants in solido, for $14.26 per week for 300 weeks beginning September 27, 1955, with 5% interest on all past due installments, and judgment in favor of Holland’s three stepchildren in the amount of $4.75 each per week for a period of 300 weeks. Burial expenses were awarded Mrs. Holland in the amount of $300. The demands on behalf of Leslie James Holland, Holland’s child by a prior marriage were dismissed on rehearing. Appeals were granted Mrs. Emey Holland, on behalf of her minor son, Leslie James Holland, as well as Mrs. Dula Marie Holland and both insurance companies.
In order to determine who is liable for the payment of compensation for the deaths of Holland and Humphreys, we must decide who was their employer at the time of the fatal accident.
56 C.J.S. Master and Servant § 330 b, p. 1093 in discussing the servant of one master controlled by another states as follows:
“Where one person lends his servant to another for a particular employment, the servant, for anything done in that particular .employment, must be dealt with as a servant of the man to whom he is lent, although he remains the general servant of the person who lent him. Thus, if the servant injures, or receives injuries in such employment from the negligence of, a servant of the person to whom he is lent, the fellow-servant rule may bar recovery therefor from the person to whom he is lent. Further, if any liability should arise for the negligence of such servant in the particular employment of another master, it does not attach to the general master, but attaches rather to the special master.
“In determining whether a servant lent by one master to another has become the servant of the latter, the test ordinarily is whether, in the particular service which the lent servant is engaged to perform, he continues liable to the direction and control of his general master or becomes subject to that of the person to whom he is lent or hired. Nevertheless, the servant so lent must consent to the change of master, expressly or impliedly; and to bring the case within the fellow-servant rule the services rendered by the employee for the third person must be such as to create the legal relation of master and servant. Actual exercise of the right to control the servant of the general employer in the service of a special master is not necessary where the special master is willing to rely on the experience and skill of the lent servant. The fact that the general master pays the wages of the servant does not preclude him from becoming pro hac vice the particular servant of another.”
Malone, in his text on Louisiana Workmen’s Compensation Law and Practice, on Page 61, in discussing borrowed employees says:
“One employer may lend his employee (sometimes together with a piece of equipment, such as a truck or tractor) to another. If the employee is injured while performing the work of the borrower, who is responsible for compensation? Since the purpose of the lending arrangement is to subject the employee to the control of the borrowing employer, it generally follows that the latter alone is liable to pay compensation, despite the fact that the lender pays the wages of the employee, and retains the right to dismiss him or substitute another in his place. However, it is now generally conceded that for some purposes the claimant may still be regarded as being in the employment of the lender, as where, for instance, he is injured *882 while repairing or maintaining a piece of equipment that was entrusted to him by the lender. Likewise, if the equipment is highly complex or specialized, so that the borrower would not likely direct the method of operation, the employee may be regarded as subject to the control of the lender in operating it.
“A lending arrangement is in effect a three party agreement. This means that not only must there be an understanding between lender and borrower; but the employee, as well, must have consented to the change of masters. For example, a construction laborer was ordered by the company employing him to perform work on the private property of one of the company’s officers under an arrangement whereby the company continued to be responsible for his wages, but was to be reimbursed by the officer. This was without the knowledge of the employee, who reasonably believed that he was doing company work subject to its orders. Under these circumstances the company was not allowed to deny that the claimant, who was injured during this assignment, was its employee.
“Generally speaking, the lending employer has no interest in the result to be accomplished by the borrower through the medium of the borrowed employee. His sole undertaking is to make the employee available for the borrower’s work, and to that purpose he relinquishes control of his servant.”
On Page 66, in discussing Partnership Employments and Joint Enterprises, Mr. Malone says:
“One employee may divide his time between two or more employers. If each of these has separate work to be done and each exercises exclusive control over the employee during the time the latter is working for him, the employments should be designated as separate and successive. Under such circumstances the injured employee is concerned only with the employer for whom he was working at the time of the accident. The fact that the claimant did not devote all his time to the work of this employer may be important in determining the wage upon which compensation is to be based, but it does not create a joint employment so as to subject the other employers to liability. Furthermore, the power to control the doing of the work, rather than liability for wages, is determinative as to who was employer at the time of the accident. Thus, P may agree with A that he will work for A during the mornings and for B during the afternoons, but that A is to be solely responsible for the entire day’s wage. If P is injured while doing B’s work he must look exclusively to B for compensation, unless it was also understood that by reason of A’s payment of the wage he was to have a controlling hand in the work.
“If, however, the employee is subject to the joint control of several employers at the same time and for the same work, he is entitled, if injured to subject them all to his compensation claim. The amount for which each employer can be made liable is discussed in the following paragraphs; but there is no reason why only one employer should be held to the exclusion of the others.
“If the work being done at the time of the accident was in furtherance of a joint enterprise shared by all employers, so that each of them had a direct financial interest in the entire job, we are presented with a case of partnership or joint enterprise liability. Under these circumstances there is in reality only one employer, namely the *883 partnership. Each partner controls the work for the benefit of himself and the other partners as well; and if one employer only is sued, he can insist that the others be joined and that liability be imposed first upon the partnership assets, if any. The individual liability of the partners is determined according to Articles 2872 and 2873 of the Louisiana Civil Code.”
In Benoit v. Hunt Tool Co., 219 La. 380, 53 So.2d 137, 140, Justice Hawthorne thoroughly explored the so-called “whose business” and “control” test, and concluded that these two tests are really one and the same ánd determining who controls the servant is merely a means of determining in whose business the servant is engaged.
In this case Justice Hawthorne stated:
“It is a well settled principle of law that the master is liable for the torts of his servant committed in the scope and course of his employment, but it is often difficult where two possible masters are involved to determine which is liable for the tort, and to determine such liability we must look to the doctrine of the borrowed servant or employee pro hac vice. In determining liability under this doctrine in some cases the courts have imposed liability on the person in whose business the employee was engaged at the time the tort was committed. In others the test has been the right of control over the servant at the time the tort was committed. It has been pointed out that in applying the latter test it is often difficult to decide just what fact or facts constitute control. Mere division of control does not, in itself, raise the presumption of surrender of control, but there is a presumption that the general employer is liable, and it rests upon him to show that, as to the particular work in question, the servant has been lent and is performing only the borrower’s work, and that he was not the defendant’s servant at all. It has been said that even the control test is not an infallible one, and that the elements of each case must be taken into consideration. Where, however, it is clear that control by the defendant was coupled with performance for the defendant and in the defendant’s business, the result is certain.”
Justice Hawthorne further stated:
“In the instant case Guillory was in the general employ of Hunt Tool Company, which selected him, paid his wages, and had the right to discharge him for any cause. By agreement with Morris & Meredith, Hunt Tool Company was to do its regular business through its servants in the common way, and Guillory was doing the work of this defendant, that is, rendering welding service, for which it was to receive an agreed compensation. The materials and welding equipment were its own. The work was done by the defendant for a price as its own work by and through its own instru-mentalities and servants in its general employ.
“Since Guillory was in the general employ of Hunt Tool Company, it must appear from the evidence in order for it to be relieved from liability that the relation of master and servant which existed between them had been suspended,. and that a new like relation between Guillory and Morris & Meredith had been created and was in existence at the time of the accident.
“Under the circumstances of this case we conclude that it was the work of Hunt Tool Company which was being performed, and that that company had not relinquished the right to control Guillory in the performance of it. The fact that the official of Morris & Meredith suggested that Guillory use an electric torch in the welding of the tank, and that Morris *884 and Meredith pointed out the welding to be done, did not constitute authoritative direction and control but was merely suggestion as to details and constituted necessary cooperation in the work being furnished in the larger undertaking.
"We therefore conclude that Guil-lory was not the borrowed servant of Morris & Meredith but was the servant or employee of Hunt Tool Company at the time the accident occurred.”
The facts of the blunt Tool Co. case are easily distinguishable. In the Hunt case, the employee was in the general employment of Hunt Tool Company, and was performing duties of the Hunt Tool Company at the time of the accident. He was under the control of Hunt Tool Company at the time of the accident, and the mere fact that the representative of Morris & Meredith suggested details of the work to be done did not create a relationship of master and servant between Guillory and Morris & Meredith.
The facts of the present case show that Bon Air Ranch and N. P. Martone were entirely separate businesses. Bon Air Ranch was in the business of raising cattle, while Martone was a rice farmer. Bon Air had no interest whatsoever in the harvesting of rice at the time of the accident. The rice was being harvested from lands of Farmers Land and Canal Company. Bon Air had nothing whatsoever to gain or lose from the harvest. The record shows, without contradiction, that both Holland and Humphreys knew when they were working for Bon Air, and they knew when they were working for Mr. Martone. The record shows that when they' worked for Martone, they would sometimes jokingly say “I guess I will be a farmer today.” The harvesting of the rice was under the exclusive jurisdiction and control of Mr. Martone as owner of the business and was solely for his benefit. He was supervising the operations at the time of the accident.
Mr. Martone, as owner, had the right to discharge his employees. He also had the right to discharge Holland and Humphreys from their duties in the field. We do not feel that they could be considered employees of Bon Air Ranch during the rice harvesting merely because Mr. Martone, who individually owned the rice crop was also the manager of Bon Air Ranch.
In Standard Oil Company v. Anderson, 212 U.S. 215, 29 S.Ct. 252, 254, 53 L.Ed. 480, the Supreme Court of the United States said:
“It sometimes happens that one wishes a certain work to be done for his benefit, and neither has persons in his employ who can do it nor is willing to take such persons into his general service. He may then enter into an agreement with another. If that other furnishes him with men to do the work, and places them under his exclusive control in the performance of it, those men become pro hac vice the servants of him to whom they are furnished. But, on the other hand, one may prefer to enter into an agreement with another that that other, for a consideration, shall himself perform the work through servants of his own selection, retaining the direction and control of them. In the first case, he to whom the workmen are furnished is responsible for their negligence in the conduct of the work, because the work is his work, and they are, for the time, his workmen. In the second case, he who agrees to furnish the completed work through servants over whom he retains control is responsible for their negligence in the conduct of it, because, though it is done for the ultimate benefit of the other, it is still, in its doing, his own work; To determine whether a given case falls within the one class or the other we must inquire whose is the work being performed,— a question which is usually answered *885 by ascertaining who has the power to control and direct the servants in the performance of their work. Here we must carefully distinguish between authoritative direction and control, and mere suggestion as to details or the necessary cooperation, where the work furnished is a part of a larger undertaking.”
The Standard Oil case was cited with approval in both the Hunt Tool case, supra, and in Spanja v. Thibodaux Boiler Works, Inc., La.App., 2 So.2d 668, 674. We feel that, under the doctrines as set forth in the Standard Oil Company case, and the test as used in the Hunt case, Holland and Humphreys were pro hac vice the servants of Mr. Martone insofar as the harvesting ■was concerned. Although Bon Air Ranch paid their wages during harvest operations, they were loaned to Mr. Martone who had complete control over them.
In the Spanja case, Spanja and another owned a boat which was rented as a standby boat to the Texas Co. He was assigned duties as standby for an oil rig located in marsh land near Empire, Louisiana. Repairs were needed to a steam boiler at the rig, and the Thibodaux Boiler Works sent machinery and a truck to do the repair work. Spanja was ordered to transport the truck with machinery from Empire to the rig. It was the job of the Thibodaux employees to load the truck and machinery on the boat furnished by the Texas Company. In loading the truck and machinery on the boat, Spanja, who was assisting in the loading operations, sustained serious injuries. Spanja sued the Thibodaux Company in tort. The court held Spanja to be a borrowed servant of the Thibodaux Company and dismissed the tort action. The holding of the Court was as follows:
“It could well have been said under such circumstances that, impliedly, his [Spanja’s] job with the Texas Company was to transport anything which might be necessary. But the transferring of the machinery was not his job and it was not the job of the Texas Company. It was the job of the Thi-bodaux Company and when, at the request of employees of that company, he undertook to assist them in their particular work, he became an employee of their employer, the Thibo-daux Company.”
We believe that the factual situation of the present case is even more favorable for application of the “Borrowed Servant Doctrine” than was the Spanja case. Of course, Mr. Martone’s insurer claims that Holland and Humphreys were employees of Bon Air, and, in the alternative, that they were joint employees of Bon Air and Mr. Martone. The only facts which could possibly tend to such conclusion were (1) Holland and Humphreys were paid by Bon Air and (2) Mr. Martone was General Manager of Bon Air, as well as owner of his rice farms.
We conclude that Holland and Humph-reys were borrowed servants of Mr. Mar-tone at the time of the accident. It follows that an employer-employee relationship existed between Mr. Martone, on one hand, and Holland and Humphreys, on the other hand, at the time of the accident, and for which Mr. Martone’s insurer is liable.
Although an appeal was lodged 'by Mrs. Emey Holland, on behalf of her minor son, Leslie James Holland, no brief has been filed on her behalf. The record discloses, however, that Leslie James Holland was a child of a prior marriage between Clifton Holland and Mrs. Emey Holland. Leslie was not living with his father, nor was he dependent upon his father, at the time of the accident. Clifton Holland very irregularly made gifts, or sent small sums of money, to Leslie. At most, Leslie could only be considered partially dependent upon his father.
LSA-R.S. 23:1232 provides that payments to a surviving widow and two or more children shall comprise the maximum sixty-five percent of wages allowed *886 by the Compensation Act. It was shown that Holland’s widow, Mrs. Dula Marie Holland and her three minor children were entirely dependent upon Holland for support. Therefore, Leslie Holland, the partial dependent, falls within the scope of LSA-R.S. 23:1252 which provides that if there are sufficient wholly dependent persons to take up the maximum compensation, the death benefit shall be divided equally among them to the exclusion of the partial dependent.
We believe that Mrs. Holland is entitled to penalties and attorney fees as claimed under LSA-R.S. 22:658. There was no question but that petitioners were entitled to benefits under the compensation act. The only question was as to which insurance company, if not both, was liable. The two companies could have easily entered into an agreement to pay petitioners and then submit the controversy between themselves to arbitration. Or, either company could have offered half the amount due until the matter was settled. Instead, the companies arbitrarily let the widow and children suffer the hardships of a long and tedious legal proceeding which was merely a contest between the two insurance companies to fix liability on the other. It was necessary for petitioners to commence the proceeding to determine who was liable to them. We conclude that the refusal to pay benefits was arbitrary, capricious and without probable cause under the doctrine as set forth in Wright v. National Surety Corporation, 221 La. 486, 59 So.2d 695 and Fruge v. Pacific Employers Ins. Co., La.App., 71 So.2d 625, affirmed 226 La. 530, 76 So.2d 719.
For the reasons herein assigned, the judgment of the Lower Court is reversed, as it pertains against defendant American Casualty Company; and it is affirmed as it pertains against Marquette Casualty Company, but is amended so as to include penalties and attorney fees; and accordingly :
There is judgment herein in favor of petitioner, Mrs. Dula Marie Holland, and against defendant, Marquette Casualty Company, for compensation in the sum of $14.26 per week for a period not exceeding 300 weeks beginning September 27, 1955, with interest at 5% per annum on each past due installment from its due date until paid; and in favor of Daniel Gene Stanley, Judy Faye Sensat, and Paulette Gayle Sensat, and against defendant, Marquette Casualty Company, for compensation in the sum of $4.75 each per week for a period not exceeding 300 weeks commencing on September 27, 1955, with interest at the rate of 5% per annum on each past due installment from its due date; and
There is judgment herein in favor of petitioner, Mrs. Dula Marie Holland, and against Marquette Casualty Company, for burial expenses in the sum of $300,' with interest at the rate of 5% per annum from judicial demand until paid; and
There is judgment herein in favor of petitioner, Mrs. Dula Marie Holland, and against defendant, Marquette Casualty Company, for penalties in the amount of 12% on all weekly compensation payments which are now due, with like penalty on all such payments which might become sixty days overdue, together with attorney’s fees payable to the plaintiff in the sum of $500.-00. All costs are to be paid by the defendant Marquette Casualty Company.
Reversed in part; amended and affirmed in part.