**ALUMINUM COMPANY OF AMERICA, Appellant,**

v.

**Cecile Stout WARD, Appellee.**

**No. 12539.**

United States Court of Appeals
Sixth Circuit.

April 10, 1956.

R. R. Kramer, Knoxville, Tenn., (Charles E. McNabb, Kramer, Dye, McNabb & Greenwood, Knoxville, Tenn., on the brief), for appellant.

W. W. Piper, Knoxville, Tenn., (H. G. Fowler, Fowler, Rowntree & Fowler, Knoxville, Tenn., on the brief), for appellee.

Before SIMONS, Chief Judge, and MARTIN and STEWART, Circuit Judges.

SIMONS, Chief Judge.

For the death of her husband, William A. Ward, the appellee sought and obtained a judgment against the appellant based upon negligence. A first trial of the issues involved having proved abortive because of failure of the jury to agree, the case was retried resulting in the presently challenged judgment. The appellant's motion for judgment in its favor notwithstanding the verdict, having been denied, it appealed.

Ward was a truck driver for the Dixie-Ohio Express Company, (D.O.X.) a common carrier by motor vehicle. His equipment was a tractor and trailer. With it on the day of the accident he was transporting a load of aluminum from the appellant's plant at Alcoa, Tennessee, to points in Ohio and New York. While making a left turn from one street to another, in Knoxville, both tractor and trailer overturned, resulting in Ward's death. There is substantial and cumulative evidence that the accident was caused by the shifting of the load on the trailer and this the appellant appears to concede, for it suggests no negligence of Ward in respect to speed or carelessness in making the turn. The theory upon which the appellant was sought to be held was that the Aluminum Company undertook to load the trailer, as it did with the many trailers employed by it for delivery of its product, that it had negligently loaded and braced its cargo and that, as a result, the tractor and trailer overturned and killed the decedent.

The principle upon which the Aluminum Company seeks to defeat liability is that it did not load and brace the cargo; that such work was being performed solely by the carrier; that although the loading and bracing was done by the Aluminum Company's general employees they were loaned to the carrier for that purpose and, so, came within the loaned servant doctrine. It also contended that

while the decedent was not present at the time of the loading and bracing, he was charged with knowledge of the weight of the cargo, the manner of its loading, and the hazard of driving a tractor so loaded and, therefore, had assumed the risk of any injury which might occur to him.

The proofs show that Davis, a fellow employee of Ward, had towed the trailer from the Aluminum Company plant where it had been partially loaded to a cafe where he had stopped for coffee; that the decedent there joined him, having arrived towing an empty trailer; that they there exchanged trailers; that Davis advised the decedent of the approximate weight of the cargo in the front of the trailer and also that there were two boxes at the back that were to go off at the carrier's loading dock in Knoxville where the loading of the trailer was to be completed by taking on a cargo from another trailer which the decedent had towed from Alcoa to Knoxville and that the decedent then proceeded to drive the tractor-trailer toward Knoxville, to the place where the accident occurred.

Davis said he was not only a truck driver but for a year prior to the accident had been a supervisor for the carrier, supervising the loading of all of its trailers at the Aluminum Company's Alcoa plant, and had supervised the loading of the trailer here involved. Although the Aluminum Company paid the loading crew, furnished the wood, timbers, nails and steel bands used in bracing the cargo and performed this work with its own equipment, it was under his direction and supervision, the loaders doing only the actual mechanical work. The present load consisted of fourteen wooden crated boxes of sheet aluminum, stacked one on top of the other, each box being banded on both ends with appropriate steel bands and the entire stack of fourteen boxes banded together by equally sufficient steel bands. The fourteen crate high stack was braced by 2 x 4s nailed to the floor with 30-penny nails. The total weight of this stack was 8125 lbs. Back of the stack, and toward the rear of the trailer, were placed two boxes of aluminum sheets with a total of 1672 lbs. These were on the floor of the trailer and were not braced because Davis didn't deem it necessary with no more weight than they contained.

Davis further testified that the procedure followed in the loading and bracing of the aluminum in the trailer was in accordance with the method pursued in the loading of all D.O.X. trailers at Alcoa. He always backed his trailer into the dock, told the company checker what and how he wanted it done, and the trailers were loaded according to his instructions; that on occasions, when the loading or bracing was not done as instructed, he refused to move the trailer until it was loaded and braced as he had directed; that sometimes he would not require boxes of aluminum to be braced, where in his judgment it was unnecessary; that no one but he at any time gave any directions for loading D.O.X. trailers and that on the occasions when he thought a load was not braced safely he went to the loading or bracing crew and told them what to do. Occasionally, however, he went to the Aluminum Company foreman, if this was more convenient, and told him what changes were to be made and had no trouble in getting the crew to follow his instructions. Davis' evidence, in this respect, was in part corroborated by other supervisors, by the Assistant Business Agent in Knoxville for the Teamsters' Union and some of the members of the loading crew.

On the basis of this evidence, the Aluminum Company insists a legal conclusion follows that the responsibility for the loading and bracing was upon the trucker because the employees who performed the loading and bracing became servants of the trucker, and if such employees were negligent the Aluminum Company was not responsible. This leads us to a consideration of the loaned servant doctrine as it may be spelled out from relevant decisions. In Charles v. Barrett, 233 N.Y. 127, 135 N.

E. 199, 200, Chief Judge Cardozo stated the general principle in these words: "The rule now is that, as long as the employee is furthering the business of his general employer by the service rendered to another, there will be no inference of a new relation unless command has been surrendered, and no inference of its surrender from the mere fact of its division." In an illuminating opinion of Mr. Justice Christianson of the Minnesota Supreme Court in Nepstad v. Lambert, 235 Minn. 1, 50 N.W.2d 614, 620, it was pointed out that the courts have relied principally on two tests, in determining when a worker becomes a loaned servant. The first of these is the " 'whose business' test" but this test is practically valueless where the general employer's business consists of furnishing men to perform work for the special employer because by doing his job the worker is necessarily furthering and doing the business of both employers. A second test is the so-called "control" test but one danger in using this test is failing to define sufficiently the scope and meaning of the term. In a general sense, both employers frequently have powers over the employee which may be considered elements of control. He comes to the conclusion, however, that "the orders of the borrowing employer must be commands and not requests if the worker is to be found to be a loaned servant." * * * The right to discharge is one element in measuring the authoritativeness of the order, but it should not be made decisive. * * * Authority to designate only the result to be reached is not sufficient under the control test. There must be the authority to exercise detailed authoritative control over the manner in which the work is to be done."

■ Tennessee law is in accord. In Chamberlain v. Lee, 148 Tenn. 637, 642, 257 S.W. 415, 417, the court said: "In order to escape responsibility for the negligence of his servant on the theory that the servant has been loaned, the original master must resign full control of the servant for the time being. It is not sufficient that the servant is partially under the control of a third person." The Aluminum Company places great reliance upon the United States Supreme Court's decision in Denton v. Yazoo & M. Valley R. Co., 284 U.S. 305, 52 S.Ct. 141, 142, 76 L.Ed. 310, wherein the loaned servant rule was stated as follows: "When one person puts his servant at the disposal and under the control of another for the performance of a particular service for the latter, the servant, in respect of his acts in that service, is to be dealt with as the servant of the latter and not of the former." But in distinguishing the Denton case from Standard Oil Co. v. Anderson, 212 U.S. 215, 29 S.Ct. 252, 53 L.Ed. 480, and Driscoll v. Towle, 181 Mass. 416, 63 N. E. 922, Mr. Justice Sutherland, in the Denton case, said, 284 U.S. at page 311, 52 S.Ct. at page 143: "In each of these cases, the facts plainly demonstrated that the work was that of the general master, and that in doing it, the servant had not passed under the direction and control of the person for whom the immediate work was being done; the latter being looked to not for commands, but for information." The commands in Denton were found to reside in a Federal statute.

■ With these observations, we turn to the record to determine whether complete control over the loading force was placed in the trucking company, having in mind that upon a contested issue of fact we are bound by the verdict, if substantial evidence supports it. Hubert Payne was a driver for another carrier and also Assistant Business Agent of the local Teamsters' Union. He testified as to the general practices of the Aluminum Company, in respect to loading, and was asked this question: "Did you ever attempt to tell the workmen what to do or did the foreman pass the work to them?" to which his reply was: "I would tell the foreman and he normally would ask me what I thought was wrong with it and he in turn would instruct the people." To the question: "Did you ever attempt to boss or super-

vise workmen in their work or did their own foreman do that?" his reply was: "I did not supervise, no sir." The supervisor Davis, hereinbefore referred to, was asked this question: "But you didn't feel like you had direct control over the employees yourself?" and his answer was: "I didn't have any control over the employees." Burnett, a checker for D.O.X. testifying for the appellee, was asked whether the Aluminum Company had a head man there, said that it had both a checker and a foreman; that the checker checks the net weight and gross weight and the number of the boxes; then was asked this question: "And who else do you say the Aluminum Company has there?" his reply was: They have, I would imagine, a superintendent." And when asked what he did the answer was: "He is the boss over the whole thing, the shipping department." Asked whether the Dixie-Ohio employees do anything at all in actually loading the aluminum in the trailer and in bracing it, he testified: "No, that's one thing you can't do it. You strike the Aluminum Company if you do their work. They would strike. They do their own work."

■ In view of this evidence, even though controverted, the jury was warranted in drawing the inference that the Aluminum Company had not surrendered complete control of its employees to the trucking company. It had its own foreman or superintendent on the job. This was fully recognized by the trucking company supervisors who, on occasion, transmitted their instructions to the loading crew through the foreman or superintendent. The most that can be said on the subject of control is that there was divided authority and this falls short of that power to command which is the necessary element in the determination of a surrender of complete control by the general employer to the temporary employer under the loaned servant doctrine.

■ The contention that Ward had assumed the risk of injury must be rejected. Ward was not present at the time of loading. It is true that when Davis surrendered the trailer to Ward he told him of the weight of the load but nothing in the record indicates that Ward was informed of the unbraced portion of the cargo nor that he himself inspected it. Ward, of course, assumed all ordinary risks in driving the tractor and in towing the trailer but the presence of unbraced cargo was not within the category of an "ordinary risk" in the light of the clearly established practice in loading disclosed by the record. That risk Davis assumed but he was without power to assume it on behalf of Ward. Moreover, Ward was not an employee of the Aluminum Company.

■■ The contentions that the court erred in charging the jury as to the liability of joint tort feasors is without merit. In any event, we fail to perceive any prejudice in it. The suggestion in the instruction that someone other than the Aluminum Company may have been liable for the accident, if prejudicial at all, was more likely to have raised an inference more favorable to the appellant than against it. The argument that the court's instructions as to the proofs necessary to establish the defense of "assumption of risk" shifted the burden to the defendant is also without merit. A reading of the charge as a whole discloses a very careful and impressive direction to the jury of the obligation of the plaintiff to establish her case by a preponderance of the evidence.

Affirmed.