103 So.2d 895

Malacy HUMPHREYS et al.

v.

MARQUETTE CASUALTY CO. et al.

Malacy HUMPHREYS et al.

v.

MARQUETTE CASUALTY CO. and American Casualty Co.

Mrs. Dula Marie HOLLAND et al.

v.

MARQUETTE CASUALTY CO. et al.

Mrs. Dula Marie HOLLAND et al.

v.

MARQUETTE CASUALTY CO. et al.

Nos. 43641, 43653, 43662, 43663.

Feb. 10, 1958.

On Rehearing in Nos. 43,641 and 43,662, June 27, 1958.

Jacque B. Pucheu, Eunice, for plaintiffs-appellants.

Lawes, Cavanaugh, Hickman & Brame, Lake Charles, for respondent.

MOISE, Justice.

Four writs of certiorari were granted by this Court, so that we might review two decisions of the First Circuit Court of Appeal, which reversed and amended two judgments of the District Court. Suits filed in this matter were consolidated for hearing in the District Court, in the Court of Appeal, and in this Court. One opinion will suffice, with separate decrees rendered in each suit.

Clifton Holland and Joe Humphreys were electrocuted on September 27, 1955, while in the course of their employment for either the Bou-Air Ranch or N. P. Mar-

tone. Death benefit suits under the Workmen's Compensation Act were filed against Marquette Casualty Company, insurer of N. P. Martone, by—

1. Malacy Humphreys, common-law wife of Joe Humphreys, individually, and for and in behalf of her minor child, Geranda Ann Humphreys;

2. Mrs. Dula Marie Holland, wife of Clifton Holland, individually, and on behalf of her minor children, Daniel Gene Stanley, Judy Faye Sensat, and Paulette Gayle Sensat, alleged dependents of Clifton Holland; and

3. Emey Trahan, divorced wife of Clifton Holland, on behalf on her minor son, Leslie James Holland;

for maximum compensation, funeral expenses, penalties, interest, and attorneys' fees.

American Casualty Company, insurer of Bon-Air Ranch, was named co-defendant after the filing of amended pleadings.

The District Court rendered judgment in favor of Malacy Humphreys and against Marquette Casualty Company and American Casualty Company, in solido, for funeral expenses in the sum of $197.60, with legal interest. It dismissed her individual demands and rendered judgment in favor of the minor, Geranda Ann Humphreys, and against Marquette Casualty Company and American Casualty Company, in solido,

for compensation at the rate of $9.75 per week for three hundred weeks, with legal interest. The Court of Appeal reversed the judgment insofar as it pertained against American Casualty Company, and affirmed and amended it against Marquette Casualty Company so as to include 12% penalties and $500 attorneys' fees. Marquette Casualty Company and Malacy Humphreys both applied to this Court for writs, which were granted. Malacy Humphreys filed a supplemental and amended petition in this Court, praying that her attorneys' fees be increased to $3,000.

The District Court also rendered judgment in favor of Mrs. Dula Marie Holland and against Marquette Casualty Company and American Casualty Company, in solido, for burial expenses in the sum of $300, with legal interest, and for compensation at the rate of $14.26 per week for three hundred weeks, with legal interest. It rendered judgment in favor of the minors, Daniel Gene Stanley, Judy Faye Sensat, and Paulette Gayle Sensat, and against Marquette Casualty Company and American Casualty Company, in solido, for compensation at the rate of $4.75 each per week for three hundred weeks, with legal interest. The Court of Appeal reversed the judgment, insofar as it pertained against American Casualty Company, and affirmed and amended it against Marquette Casualty Company so as to allow 12% penalties and $500 attorneys' fees. Marquette Casu-

alty Company and Mrs. Holland both applied to this Court for writs, which were granted. Mrs. Holland filed a supplemental and amended petition in this Court, praying that her attorneys' fees be increased to $3,000.

The District Court dismissed with prejudice the demands on behalf of Leslie James Holland, and the Court of Appeal affirmed the action of the District Court. No writs were applied for to this Court.

The Court of Appeal, First Circuit, (95 So.2d 878, 879), correctly stated the facts as follows:

"The evidence shows that Bon Air Ranch was a partnership composed of Mrs. Zim W. Todd and her daughter, Mrs. Undine Todd Martone. It has been operated as a partnership since the death of Mr. Zim Todd in 1954. Prior to that time the ranch was operated as a sole proprietorship by Zim Todd. The ranch owned 670 acres of land, all of land, which was under lease to N. P. Martone as a rice farm. Bon Air Ranch was the lessee of an additional 15,000 acres of land from several lessors. Of the leased land, Bon Air subleased some of it to Mr. Martone as well as to others for rice farming.

"The remainder of the leased land was used by Bon Air in its cattle raising activities. It might, therefore, be said that Bon Air Ranch was in the business of raising cattle as well as in the business of leasing and then subleasing land for rice farming.

"Bon Air Ranch normally employed three 'cowboys' to assist in its ranching activities. In addition thereto, Mr. Martone was the General Manager of the ranch, a position which he occupied without remuneration except for the satisfaction of assisting in the operation of the Bon Air Ranch, which was jointly owned by his wife and mother in law. Bon Air Ranch owned its own equipment, maintained its own payroll and other records, paid its own social security taxes, carried its own compensation insurance, and had its own cattle brand. At the time of the accident, the Bon Air Ranch owned some 1,800 head of cattle.

"Mr. N. P. Martone was a rice farmer as well as a cattle rancher. He owned no real property. His business was conducted on property which he leased from others. Among the several lessors to Mr. Martone was the Bon Air Ranch. By far the greater portion of Mr. Martone's business was rice farming. As a sideline, he owned some 300 head of cattle.

"Mr. Martone ran his own business. He normally employed some six to eight employees. He owned his own equipment, kept his own payroll as

well as other accounts, paid his own social security taxes, carried his own compensation insurance, and had his own cattle brand. His business was conducted on property which he leased from others for a certain percentage of the crop raised. He owned several rice bins which were situated on property leased him from Bon Air. Bon Air also owned three bins which were adjoining those of Mr. Martone.

"The testimony reflects that the busiest time of year for cattle ranching is during the summer months. Rice farming, on the other hand, has its peak period during harvest season, which is during the rancher's slack season. It was the custom in the area for the ranchers and farmers to swap labor, so as to help each other out during their busy season. This custom prevailed between Bon Air Ranch and Mr. Martone. During harvest season Mr. Martone would use 'cowboys' to assist his laborers in harvesting the rice crop. On the other hand, during the summer the ranch would use some of the farm hands to assist the 'cowboys' in cleaning out ditches and repairing fences. The arrangement was merely a swap of time; the employee would be paid by his regular employer during the time he was assisting the other activity. Mr. Martone testified that he kept record of the 'swapped'

time in his head; that at the time of the accident the Bon Air Ranch owed him some time.

"Although there was a close family relationship between the owners of the two businesses, and they cooperated one with the other, it appears that the businesses were separate and distinct entities. Loans were acquired by each in its own name; bank accounts and charge accounts with merchants were carried by each in its own name. Had it not been for the fact that they each had separate compensation insurers, this case possibly would not be before us.

"The evidence discloses that on and for a few days prior to September 27, 1955, Mr. Martone was engaged in harvesting rice from land leased to him by Farmers Land and Canal Company. The rice was loaded on two trucks owned by Mr. Martone and transported a short distance away to a rice bin owned by Mr. Martone but situated on Bon Air Ranch. At the time, Mr. Martone had about seven regular employees on his payroll. As he needed two truck drivers and unloading helpers he told Clifton Holland and Joe Humphreys, who were both regularly employed as 'cowboys' by Bon Air Ranch, to go to the fields and assist in harvesting his rice.

"Holland and Humphreys had assisted in the harvesting for a few days prior to the accident. On the morning of September 27, 1955, prior to commencing the day's harvesting activity, it was necessary to move a horizontal and vertical auger from one bin to another bin. Holland and Humphreys assisted in moving the equipment, which came into contact with power lines resulting in the electrocution and death of both Holland and Humphreys."

The Court of Appeal found that the defendants disputed liability between themselves, but that they agreed that the accident occurred while the deceased were in the scope of their employment and that their dependents legally recognized under the Workmen's Compensation Law were entitled to compensation. The Court of Appeal concluded that N. P. Martone had borrowed the services of Humphreys and Holland and that the "Borrowed Servant Doctrine" applied to the controversy. It, therefore, held Marquette Casualty Company liable to the legally recognized dependents.

The principal question before us is whether the "Borrowed Servant Doctrine" applies to N. P. Martone and his insurer, Marquette Casualty Company, or whether a solidary obligation exists between Marquette Casualty Company and American Casualty Company. Both insurance companies agree that the awards are correct, except for the penalties and attorneys' fees. Malacy Humphreys, common-law wife of Joe Humphreys, still insists that as a dependent she is entitled to compensation. Plaintiffs' compensation demands are consistent with their original demands, except for their prayers for an increase in attorneys' fees.

In 35 Am.Jur., Master and Servant, sec. 18, p. 455, we find the following discussion of "Lending of Employee to Another":

"One who has the status of general servant or employee may be lent or hired by his master to another for some special service so as to become, as to that service, the servant of such third person, the test being whether, in the particular service which he is engaged to perform, he continues to be under the direction and control of his master or becomes subject to that of the person to whom he has been lent or hired. Where an employee, with his consent, has thus been lent by his general employer to another person, he is deemed to have become, for all purposes of the relationship of master and servant, the employee of the borrower. For the time being, he is subject to the borrower's control and direction. However, the conclusion as to his status is the same regardless of the showing as to whether the person to whom he has been lent ac-

tually exercises his right of control or direction as to the details of the work, or simply sets the servant to do what is necessary, trusting to his expert skill for the result.

"To establish the fact that the servant of one has transferred his services to another pro hac vice, it must appear that he has assented, expressly or impliedly, to such transfer. No one can transfer the services of his servant to another master without the servant's consent. It must further appear that the servant has, in fact, entered upon the service and submitted himself to the direction and control of the new master. His assent may be established by direct proof that he agreed to accept the new master, and to submit himself to his control, or by indirect proof of circumstances justifying the inference of such assent. Such evidence may be strong enough to justify a court in removing the question from the jury, or it may be required to be submitted to the jury."

See, Dougall v. Spokane, P. & S. Ry. Co., 9 Cir., 207 F.2d 843, certiorari denied 347 U.S. 904, 74 S.Ct. 429, 98 L.Ed. 1063.

In Standard Oil Company v. Anderson, 212 U.S. 215, 29 S.Ct. 252, 254, 53 L.Ed 480, the United States Supreme Court thoroughly discussed the "Borrowed Servant Doctrine", as follows:

"It sometimes happens that one wishes a certain work to be done for his benefit, and neither has persons in his employ who can do it nor is willing to take such persons into his general service. He may then enter into an agreement with another. *If that other furnishes him with men to do the work, and places them under his exclusive control in the performance of it, those men become pro hac vice the servants of him to whom they are furnished.* But, on the other hand, one may prefer to enter into an agreement with another that that other, for a consideration, shall himself perform the work through servants of his own selection, retaining the direction and control of them. In the first case, he to whom the workmen are furnished is responsible for their negligence in the conduct of the work, because the work is his work, and they are, for the time, his workmen. In the second case, he who agrees to furnish the completed work through servants over whom he retains control is responsible for their negligence in the conduct of it, because though it is done for the ultimate benefit of the other, it is still, in its doing, his own work. *To determine whether a given case falls within the one class or the other we must inquire whose is the work being performed,— a question which is usually answered*

*by ascertaining who has the power to control and direct the servants in the performance of their work.* Here we must carefully distinguish between authoritative direction and control, and mere suggestion as to details or the necessary cooperation, where the work furnished is part of a larger undertaking." (Italics ours.)

In Standard Oil Co. v. Ogden & Moffett Co., 6 Cir., 242 F.2d 287, 290, we find the following statement as to the intricacies and refinements of the "Borrowed Servant Doctrine":

"As the late Mr. Justice Cardozo observed in A Ministry of Justice, 35 Harvard Law Review, 113, at 121: 'The Law that defines or seeks to define the distinction between general and special employers is beset with distinctions so delicate that chaos is the consequence.' Professor Talbot Smith, now Mr. Justice Smith of the Michigan Supreme Court, in 38 Michigan Law Review, 1222, in a scholarly exposition of the loaned servant problem, examined the various tests that have been applied and arrived at a somewhat similar conclusion. Observing that one who seeks an explanation of the borrowed servant cases, in terms of weighing the elements of control, is 'inexorably driven to the expedient of making and accepting "desperate refinements," etherial in substance and

revolting in reason, in order to approach any semblance of reconciliation.' We recently concluded in Aluminum Company of America v. Ward, 6 Cir., 231 F.2d 376, at page 380, that where there is divided authority, and the borrower falls short of the power to command, there is lacking the necessary element in determining surrender of control by the general employer to a temporary employer under the loaned servant doctrine. These concepts lead to the conclusion that each case must be decided upon its own circumstances and, where the facts are not in dispute, the question is one of law. While an analysis of Michigan cases does not disclose precisely controlling tests, the Michigan Supreme Court, in White v. Bye, 342 Mich. 654, 70 N.W.2d 780, 782, declared the rule in Standard Oil Company v. Anderson, 212 U.S. 215, 29 S.Ct. 252, 256, 53 L.Ed. 480, to be: 'the most important and significant.' * * *" See, Louis v. Youngren, 12 Ill.App.2d 198, 138 N.E.2d 696; 35 Am.Jur., Master and Servant, sec. 158, p. 587; Densby v. Bartlett, 318 Ill. 616, 149 N.E. 591.

The loaned servant doctrine is established in Louisiana, and in the case of Benoit v. Hunt Tool Co., 219 La. 380, 53 So.2d 137, 140, we stated:

"It is a well settled principle of law that the master is liable for the torts of

his servant committed in the scope and course of his employment, but it is often difficult where two possible masters are involved to determine which is liable for the tort, and to determine such liability we must look to the doctrine of the borrowed servant or employee pro hac vice. In determining liability under this doctrine in some cases the courts have imposed liability on the person in whose business the employee was engaged at the time the tort was committed. In others the test has been the right of control over the servant at the time the tort was committed. It has been pointed out that in applying the latter test it is often difficult to decide just what fact or facts constitute control. Mere division of control does not, in itself, raise the presumption of surrender of control, but there is a presumption that the general employer is liable, and it rests upon him to show that, as to the particular work in question, the servant has been lent and is performing only the borrower's work, and that he was not the defendant's servant at all. It has been said that even the control test is not an infallible one, and that the elements of each case must be taken into consideration. Where, however, it is clear that control by the defendant was coupled with performance for the defendant and in the defendant's business, the result is certain.

"Some courts follow the so called 'whose business' test; others the 'control' test. According to the Supreme Court of the United States these two tests are really one and the same, and determining who controls the servant is merely a means of determining in whose business the servant is engaged. The Standard Oil Company v. Anderson, 212 U.S. 215, 29 S.Ct. 252, 53 L.Ed. 480; Denton v. Yazoo & Mississippi Valley Railroad Co., 284 U.S. 305, 52 S.Ct. 141, 76 L.Ed. 310; see Brown, Lent Servant Doctrine, Insurance Law Journal of 1949, pp. 343–350; Note, 44 Harv.L.Rev. 1136." See, B & G Crane Service v. Thomas W. Hooley & Sons, 227 La. 677, 80 So.2d 369; Spanja v. Thibodaux Boiler Works, Inc., La.App., 37 So.2d 615, La.App., 33 So.2d 146; Duke v. Dixie Bldg. Material Co., Inc., La.App., 23 So.2d 822.

Applying the above tests to the facts of the present case, we find that the deceased at the time of their deaths were "loaned" or "borrowed" servants. They were paid by Bon-Air Ranch, but the evidence clearly shows that the method of payment was by the custom of the particular vicinity in which the deceased worked. The general employer continued to pay his employees' salaries when they were loaned to rice farmers, because he, likewise, borrowed servants from the rice farmers dur-

ing their slack seasons, and these servants' salaries were paid by their general employers. Mr. N. P. Martone, as manager of his rice farming business, had direct control over the deceased. Their hours, duties, and method of work were controlled by him. There is no doubt that he could have discharged the deceased had they not worked in an obedient and satisfactory manner. It is an extraneous circumstance that he could have also discharged them when he was acting as Manager of Bon-Air Ranch. The deceased employees were aware of the custom of swapping employees, and they knew that they were working as farmers and not as "cowboys". Mr. Martone's testimony is that:

"* * * In their own minds I should think that they would know whether they were performing work for me or for Bon-Air."

The rice which was loaded into the bins had been harvested from the land of Farmers Land and Canal Company and not from Bon-Air Ranch property. It was loaded into Martone's bins and was to be disposed of by him. The record also reflects that Mr. Martone kept separate records of the time the deceased worked for him. All of this negates a joint employer relationship between N. P. Martone and Bon-Air Ranch. It is further negated by the fact that Martone's assets, liabilities, profits and expenses were not commingled with those of Bon-Air Ranch. All bank accounts and loan accounts were separate and individual, even though a relationship existed between Mr. Martone and the owners of Bon-Air Ranch.

■ We conclude, as did the Court of Appeal, "that an employer-employee relationship existed between Mr. Martone, on the one hand, and Holland Humphreys, on the other hand, at the time of the accident, and for which Mr. Martone's insurer," Marquette Casualty Company, "is liable."

We come next to the question of whether a common-law wife can recover death benefits under the Workmen's Compensation Act for herself individually. Malacy Humphreys testified that she had lived with Joe Humphreys for thirty-two years, and that during that time she had never lived with any one else. She said that she and Joe had resided under the same roof and had never separated. She stated that she was not working when Humphreys was killed. Her testimony is substantiated by that of other witnesses.

Counsel for the concubine contends that in determining whether a person is entitled to death benefits under the workmen's compensation laws, the question presented is one of dependency rather than that of relationship, and that in this case, Malacy was a dependent of the deceased Humphreys.

LSA–Revised Statutes 23:1232, paragraph (8), provides:

" * * * If other dependents than those enumerated, thirty-two and one-half per centum of wages for one, and eleven per centum additional for each such dependent in excess of one, subject to a maximum of sixty-five per centum of wages for all, regardless of the number of dependents."

█ In its decision (95 So.2d 878), the Court of Appeal discussed the above quoted provision of the Workmen's Compensation Statute, as well as all prior jurisprudence on this point. We feel that we can add little to its opinion, except to say that it was never within the contemplation of the legislature to include under the provisions of LSA–R.S. 23:1232, a dependent who had lived in open concubinage with a deceased during his lifetime.

In the case of Moore v. Capitol Glass & Supply Co., La.App., 25 So.2d 248, 250 Writs Refused, Justice LeBlanc so well stated:

"The status of the plaintiff in this case is different. She is responsible for the illegal relation which she assumed and carried on with the deceased employee. There was no duty on his part to support or care for her. Either was at liberty to break off or terminate the relation at his or her own pleasure without any recourse whatever to the other. The workmen's compensation statute, being social legislation, there

may be sound economic and legal reason to apply its liberal provisions to children who are the innocent victims of such illicit relations by including them in that class of dependents embodied in the deceased employee's 'family', within the meaning of that term as used in that kind of legislation; but by no strained construction should the use of that word in the statute be extended so as to bring within its folds, no matter how freely it has to be interpreted, those who voluntarily enter into a relation not countenanced by the law of this State, in which there is no legal duty on the part of anyone and from which either party may retire at will." See, also, Patin v. T. L. James & Co., Inc., La.App., 39 So.2d 177.

The following syllabus of the case of Simpson v. Norman, 51 La.Ann. 1355, 26 So. 266, well states the predicate for disallowing a concubine to recover under such conditions as are advanced in the instant proceeding:

"When the taint exists, it affects fatally, in all its parts, the entire body of the claim.

"Where there is turpitude, the law will help neither party to the transaction." See also, Sparrow v. Sparrow, 231 La. 966, 93 So.2d 232.

█ We conclude, as did the Court of Appeal, that Malacy Humphreys, the com-

mon-law wife of Joe Humphreys, is not entitled to death benefits under the provisions of LSA–R.S. 23:1232, sec. 8.

■ Marquette Casualty Company contends that a valid dispute existed among all parties as to the assessment of liability, and that, therefore, it should not be held liable for penalties.

As did the Court of Appeal, we conclude that:

"* * * There was no question but that petitioners were entitled to benefits under the compensation act. The only question was as to which insurance company, if not both, was liable. The two companies could have easily entered into an agreement to pay petitioners and then submit the controversy between themselves to arbitration. Or, either company could have offered half the amount due until the matter was settled. Instead, the companies arbitrarily let the widow and children suffer the hardships of a long and tedious legal proceeding which was merely a contest between the two insurance companies to fix liability on the other. It was necessary for petitioners to commence the proceeding to determine who was liable to them. We conclude that the refusal to pay benefits was arbitrary, capricious and without probable cause under the doctrine as set forth in Wright v. National Surety Corporation, 221 La. 486, 59 So.2d 695, * * *"

The doctrine above mentioned is to the effect that:

"It is seen that the statute, which is written into the policy, makes it the direct obligation of the insurer to pay the injured employee. Thus, the employee is constituted, for all intents and purposes, the insured under the policy. The fact that LSA–R.S. 22:658, as a penalty statute, is subject to strict construction, does not necessitate an interpretation which leads to consequences plainly unintended by the lawmaker. A reading of the statute reveals a clear intent and purpose to penalize the arbitrary refusal of insurers to pay just claims after 60 days notice of the loss. Manifestly, in workmen's compensation cases, the loss is sustained by the employee and the obligation imposed on the insurer by the Employer's Liability Act (LSA–R.S. 23:1162) is directly in favor of such employee; it is to him that the claim is payable. To hold otherwise, would require that we blind our eyes to obvious realities and render impotent the provisions of LSA–R.S. 22:658 in so far as workmen's compensation policies are concerned. This we will not do." Wright v. National Surety Corp., 221 La. 486, 59 So.2d 695, 699. See, also Fruge v. Pacific Employers Insurance Company, 226 La. 530, 76 So.

2d 719; Hall v. Pipe Line Service Corporation and St. Paul Mercury Indemnity Co., 233 La. 821, 98 So.2d 202.

Attorneys for plaintiffs contend that when penalties are allowed, their fees are not limited by the provisions of LSA–R.S. 23:1141, which provides:

"In no case shall the fees of an attorney who renders services for an employee coming under the provisions of this Chapter exceed twenty per centum of the amount of the award, provided that the maximum fee shall in no case exceed one thousand dollars."

Counsel for plaintiffs further urge that the purpose of the above statute is to prevent attorneys from charging the claimant more than 20% of the award, with a maximum of $1,000, and that this provision is for the protection of the claimant and is not applicable where the defendant is compelled to pay the attorney's fees. They argue that the provisions of LSA–R.S. 22:658[1] are applicable to the present controversy and that therein no limit is set on attorneys' fees other than that they be reasonable. Because of the amount of work entailed in compiling the voluminous record for this review, they suggest that the original prayer of plaintiffs' petitions for $1,000 as attorneys' fees should be increased to $3,000 for each counsel.

When penalties are allowed in a workmen's compensation proceeding, attorneys' fees are allowed in addition to the compensation award. Hall v. Pipe Line Service Corporation, 233 La. 821, 98 So.2d 202. However, under no condition can an award exceed a demand, because in Article 156 of the Code of Practice it is stated:

"If one demands less than is due him, and do not amend his petition, in order to augment his demand, he shall lose the overplus."

We agree with counsel that their work has been lengthy and extensive; but, since this Court is one of appellate jurisdiction, except for enumerated causes, it cannot entertain a supplemental and amended petition. We, therefore, conclude that each counsel is entitled to the original demand of $1,000.

1. "All insurers issuing any type of contract other than those specified in R.S. 22:656 and 22:657, shall pay the amount of any claim due any insured including any employee under Chapter 10 of Title 23 of the Revised Statutes of 1950 within sixty days after receipt of satisfactory proofs of loss from the insured, employee or any party in interest. Failure to make such payment within sixty days after receipt of such proofs and demand therefor when such failure is found to be arbitrary, capricious, or without probable cause, shall subject the insurer to a penalty, in addition to the amount of the loss, of 12% damages on the total amount of the loss, payable to the insured, or to any of said employees, together with all reasonable attorney's fees for the prosecution and collection of such loss. * * * "

For the reasons assigned, the judgment of the Court of Appeal, First Circuit, 95 So.2d 878, in the case of Humphreys v. Marquette Casualty Co., No. 43,641 of the Docket of this Court, is amended, so as to allow the plaintiff attorney's fees in the sum of $1,000; in all other respects, it is affirmed. All costs are to be paid by the defendant, Marquette Casualty Company.

SIMON, J., absent.

FOURNET, Chief Justice (dissenting in part and concurring in part).

I fully concur with the view of the majority in so far as the claim of Malacy Humphreys is concerned, and also with respect to the assessment of penalties and attorney fees. But I cannot subscribe to the majority view that the so-called "borrowed servant doctrine," generally obtaining in .the common law *in tort actions,* and, to this extent, adopted by us, is controlling in compensation cases. Moreover, it is my considered opinion that an employer and insurer can never, by the application of this doctrine, relieve themselves of their responsibility to the employee as fixed by our compensation laws.

In any event, the facts of this case do not warrant the application of the "borrowed servant doctrine" here, even if it is applicable. Whether the control exercised by Martone was for himself personally, or as manager of the Bon-Air Ranch,

is problematical. The record does show that the salaries of these men were always paid by the Bon-Air Ranch, even while they were working for Martone, and there is no direct evidence, and none from which it can be inferred, establishing that these employees ever consented to accept Martone as the new employer, as is required under the doctrine.

McCALEB, Justice (dissenting in part).

I concur in the rulings of the majority herein in all respects save one. Conceding the correctness of the conclusion that Holland and Humphreys were the borrowed employees of Martone, I do not believe that this circumstance relieves the insurer of the principal employer, Bon-Air Ranch, from liability for workmen's compensation under our law. When these employees were performing personal services for Martone, manager of Bon-Air Ranch, the services rendered were incidental to their employment by Bon-Air Ranch and, hence, both it and Martone should be responsible, *in solido.*

That the regular employer of a borrowed employee is liable for workmen's compensation for accidental injuries sustained by the borrowed employee, while engaged in performance of services for the borrowing employer, has heretofore been recognized by us in the leading case of Kern v. Southport Mill, 174 La. 432, 141 So. 19. To the same effect in principle is

Dobson v. Standard Accident Insurance Co., 228 La. 837, 84 So.2d 210 and I perceive no reason why these authorities should not be applied here.

I therefore dissent from that part of the judgment which relieves American Casualty Company from liability.

On Rehearing of Nos. 43641 and 43662.

McCALEB, Justice.

We granted a rehearing to Marquette Casualty Company mainly for the purpose of reconsidering our ruling that Marquette alone was liable for the compensation benefits payable to plaintiff, for the use of her minor child, as a result of the accidental death of the employee, Joe Humphreys, while engaged in the business individually operated by N. P. Martone.

The facts of the case, which was consolidated in all courts with that of Holland v. Marquette Casualty Company, have been fully stated by the Court of Appeal (see 95 So.2d 878) and in our original opinion. Therefore, they need not be repeated again in detail.

For purposes of our present discussion, it suffices to say that Clifton Holland and Joe Humphreys were electrocuted on September 27, 1955, while temporarily performing services for N. P. Martone, a rice farmer insured by Marquette Casualty Company. They were regularly employed by Bon Air Ranch, a land-leasing and cattle-raising enterprise managed by Martone for a partnership composed of his wife and mother-in-law. Bon Air Ranch was insured for workmen's compensation liability by defendant, American Casualty Company, and Holland and Humphreys were at all times carried on the payroll of the ranch as cowboys, it being understood by them, however, that they would be required to assist Martone in his rice farming operations during the harvest season. Under this factual situation, a majority of the Court ruled on the original hearing that Holland and Humphreys were borrowed employees of Martone, engaged in his work at the time of their accidental deaths, and that Martone alone and not the general employer, Bon Air Ranch, was liable for workmen's compensation.

We are now convinced that this holding was incorrect insofar as it releases Bon Air's insurer from responsibility. Accepting as final, for purposes of this discussion, our former conclusion that Holland and Humphreys were borrowed employees of Martone [1] and that he would be liable for the torts committed by them and also responsi-

---

1. Counsel for Marquette urge on this rehearing that our prior holding that the employees were "borrowed" is not well founded. We see no reason to consider counsel's argument because the best that they could hope for would be a factual finding of joint enterprise, in which event Marquette would be liable in solido with American Casualty for compensation.

ble to them for compensation for accidental injuries sustained by them during their working hours, it does not follow that this necessarily relieves Bon Air Ranch, the regular employer, from its legal duty to pay compensation.

█ In the leading case of Kern v. Southport Mill, 174 La. 432, 141 So. 19, 20, this Court laid down the test for determining whether injuries to or death of an employee is sustained while he is "performing services arising out of and incidental to his employment in the course of his employer's trade, business or occupation * * *" as required by R.S. 23:1035. It was there held that services arise out of and are incidental to the employment whenever the employment calls for the services that are being performed at the time of the accident and that, whenever the employer directs the employee to render any particular service, "* * * he, at least (that is to say, the employer himself), is in no position any longer to deny that the services thus requested arise out of and are incidental to the employment."

· This test was recently applied in Dobson v. Standard Accident Insurance Co., 228 La. 837, 84 So.2d 210, where it was held that an employer, who has directed his employee to perform a particular service outside of the normal scope of his duties, is in no position to assert, when sued for compensation benefits for injuries resulting from an accident occurring while the em-

ployee was performing the particular service, that the services rendered by the employee at his request were disconnected from and not incidental to the employment.

█ Thus, it is evident that, since Holland and Humphreys were performing special services for Martone which they had been directed to render in compliance with their employment contracts, American Casualty, as insurer of their regular employer, may not escape liability for compensation as Bon Air Ranch cannot be heard to assert that the services which were being rendered at its request did not arise out of and in the course of the employment.

Counsel for American Casualty maintain that this case is distinguishable from the Kern and Dobson cases in that, here, the accident occurred while the employees were performing services for their special employer, Martone, who is liable for compensation, whereas, in those cases the injured employees had only their regular employers from whom compensation benefits could be claimed.

█ We perceive no justifiable foundation for the attempted differentiation. The principal upon which the regular employer is held is the same in each instance, i.e., that the special service of the employee, being performed at his principal's request, is service arising out of his employment. Hence, the circumstance that the special employer is likewise liable for compensation

affords no basis for relieving the regular employer from liability for compensation imposed by the law in virtue of the hiring contract. Indeed, it is the good fortune of the regular employer that the special employer is likewise liable and able to respond, thus contributing in part to his liability for the entire compensation due.

It was well said by the Court of Appeals of New York in De Noyer v. Cavanaugh, 1917, 221 N.Y. 273, 116 N.E. 992, 993, in speaking of the liability of a general employer for compensation in a case of this sort, that:

"* * * The fact that a workman has a general and a special employer is not inconsistent with the relation of employer and employé between both of them and himself. If the men are under the exclusive control of the special employer in the performance of work which is a part of his business, they are, for the time being, his employés. * * * Thus at one and the same time they are generally the employés of the general employer and specially the employés of the special employer. As they may under the common law of master and servant look to the former for their wages and to the latter for damages for negligent injuries, so under the Workmen's Compensation Law they may, so far as its provisions are applicable, look to the one or to the other, or to both, for compensation for injuries due to occupational hazards * * *".

■ Finding that both of the insurance companies, Marquette Casualty and American Casualty, are liable in solido for the compensation due plaintiff's child, we pass on to their contentions that penalties and attorneys' fees are not recoverable as their denials of liability were not arbitrary or capricious.

Counsel for Marquette say that, since there was a division of opinion on original hearing concerning the borrowed servant rule, this in itself is evidence of reasonable grounds for Marquette's denial of liability. And counsel for American argue that it can hardly be said that this insurance company acted arbitrarily in view of the fact that a majority of the Court of Appeal, and this Court on original hearing, found that it was not liable.

■ These arguments are not impressive. It cannot be doubted that either one or the other or both of these insurance companies were liable for compensation. This being so, they should have made provision, either collectively or separately, for payment of compensation until their respective legal liability was determined. They could not justifiably withhold all benefits and force plaintiff to undergo the legal expense and the delay in collecting an admittedly valid claim, even though each might have had reasonable grounds to litigate the issue of its legal liability for compensation.

For the foregoing reasons, the judgment of the Court of Appeal is set aside and that of the district court is amended by including therein an award in favor of plaintiff and against defendants, in solido, for attorneys' fees in the sum of $1,000 and a 12% penalty on all weekly compensation payments which are now due or which may hereafter become 60 days overdue. As thus amended, the judgment of the district court is reinstated and affirmed, defendants to pay all costs.

HAMITER, J., concurs in the decree.

TATE, J.. recused.