GLADNEY, Judge.
This suit for workmen’s compensation benefits was instituted as a result of injuries received by plaintiff on July 22, 1958, Made defendants are plaintiff’s general employer, H. G. Lunsford, d/b/a Lunsford' Drilling Company, Tri-State Oil Tool Company, his alleged special or borrowing employer, and their respective workmen’s compensation insurance carriers, National Automobile & Casualty Insurance Company and Employers Fire Insurance Company. Tri-State and its insurer filed exceptions of prematurity and prescription to plaintiff’s petition, the former being overruled and the plea of prescription being referred to the merits. Lunsford and its insurer sought, by way of third party petition, to hold Tri-State and its insurer primarily liable for any recovery had by plaintiff against them. After their exception of no right or cause of action to the third party complaint was overruled, Tri-State and its insurer reconvened against third party plaintiffs for indemnification from any judgment cast against them.
After trial, the lower court rendered judgment against Lunsford and its insurer for payments of $35 per week for the duration of plaintiff’s disability, not to exceed four hundred weeks. Plaintiff’s demands, *381 as welt as Lunsford’s third party complaint, against Tri-State and its insurer were dismissed and the court found it unnecessary to rule on the reconventional demand. A suspensive appeal was perfected by Luns-ford and its insurer, and plaintiff has appealed devolutively from that part of the judgment rejecting his demands against Tri-State and its insurer. By way of answer to the appeals Tri-State and its insurer have re-asserted their exceptions of prematurity and prescription, and, alternatively, seek indemnification from Lunsford for any judgment cast against them.
The facts surrounding the accident are not seriously disputed. On July 22, 1958, plaintiff was employed by Lunsford Drilling Company as a “roughneck” on the latter’s drilling rig near Boyce, Louisiana. On that date Tri-State Oil Tool Company, pursuant to Mr. Lunsford’s request, dispatched one of their trained engineers and certain specialized tools to the rig for the purpose of “fishing” some stuck drill pipe from the hole. During the course of the fishing operation, Max Westbrook, Tri-State’s engineer, replaced Lunsford’s driller and operated the drawworks himself without any orders or suggestions from Lunsford or his representatives. Furthermore, Westbrook directed Lunsford’s drilling crew, of which plaintiff was a member, in assembling, dismantling, and laying down the “fishing tool”. One of Westbrook’s directions was that a “bell sub”, which had been removed from the hole and weighed several hundred pounds, be placed on the rig floor rather than on the boardwalk as plaintiff had suggested. Shortly thereafter, with plaintiff in a crouching position attempting to place tongs on some wash pipe, tension was applied to a line which had accidentally caught onto the “bell sub”, the result being that the sub was jerked on top of plaintiff’s right leg and ankle. . Two members of the crew removed the weight, and Westbrook, whose job was completed within an hour of the accident, furnished plaintiff with a ride to Shreveport, where he immediately sought medical attention.
Plaintiff’s complaints were originally associated with pain in his knee and ankle, but several weeks later his back became the dominant source of pain, and his physician, Dr. Albert Bicknell, hospitalized him so that traction could be applied. Dr. Bicknell diagnosed the injury as a ruptured interverte-bral disc and referred him to his brother, Dr. Harold Bicknell, an orthopedist. The latter, on the basis of objective clinical •findings, concurred in the diagnosis of a ruptured intervertebral disc, although a myelogram test performed on plaintiff proved negative. On January 12, 1959, Dr. Harold Bicknell operated on plaintiff but failed to discover any rupture of the inter-vertebral discs. However, certain bony and ligamentous structures which were thought to be compressing the nerve roots were removed. After a period of apparent improvement plaintiff re-asserted his complaints, but Dr. Bicknell was unable to make any definite objective findings in connection thereto, and on June 10, 1959, the patient was informed that Dr. Bicknell had nothing further to offer in the way of treatment. Dr. Bicknell testified that on the last mentioned date he considered plaintiff to have attained maximum recovery, and felt that he was potentially able to return to his former work, although he estimated plaintiff’s total body disability to be approximately twenty per cent (20%).
The issues presented for disposition by this court are: (1) the nature and extent of plaintiff’s disability; (2) whether plaintiff was a borrowed employee of Tri-State Oil Tool Company at the time of his injury; and if so, (3) whether Lunsford and its insurer are entitled to indemnification from Tri-State and its insurer under the provisions of LSA-R.S. 23:1063; (4) whether such claim as plaintiff may have had against Tri-State and its insurer has been extinguished by the prescription of one year; and, (5) whether the rental contract between Tri-State and Lunsford contained an express assumption by Lunsford of all responsibility, including compensation, while the tools were in Lunsford’s posses *382 sion. In view of our conclusions as to issues (1) and (2) we are precluded from deciding issues (3), (4) and (5).
As is frequently the case in compensation claims, we are confronted with a conflict in medical testimony relative to plaintiff's disability. Dr. Albert Bicknell, a general surgeon, treated plaintiff for a considerable period prior to referring him to Dr. Harold Bicknell. His ultimate referral was predicated on a diagnosis of a ruptured intervertebral disc, and at that time, which was the last occasion Dr. Albert Bicknell had to examine plaintiff, he opined that plaintiff was unable to resume working. Dr. Harold Bicknell, an orthopedic surgeon, considered Blunt capable of returning to his normal occupation as of June 10, 1959. That opinion is modified somewhat by Dr. Bicknell’s later testimony to the effect that plaintiff had a twenty per cent (20%) disability of his body as a whole, that plaintiff would have to learn new positioning techniques before lifting heavy objects, and that plaintiff’s capacity to resume work was actually a potential capacity which would require a period of adjustment.
Plaintiff was examined by Dr. H. K. Faludi, a neurological surgeon, on July 22, 1959, and again on November 20, 1959. Dr. C. V. Hatchette, an orthopedic specialist, had occasion to examine plaintiff on October 8, 1959. Although subsequently informed that plaintiff had undergone a negative disc operation, rather than positive as they had originally been led to believe, both Drs. Hatchette and Faludi maintained their conclusions that plaintiff was unable to resume his prior occupation. Those doctors, as pointed out by defendants, were unable to assign any specific cause for plaintiff’s disability, but both considered his symptoms compatible with several possible conditions, to-wit: herniated discs in remission at the time of the operation; inflammation from excessive residue of pantopaque material in the lower lumbar or sacrum regions; and post operative formation of adhesions about the nerve roots.
Dr. Willis J. Taylor, an orthopedic surgeon, examined plaintiff on November 24, 1959, and, finding no objective evidence of injury, concluded that plaintiff was capable of returning to work.
Counsel for defendants emphasize the fact that the clinical findings upon which Drs. Hatchette and Faludi predicated their opinions involved various motion limitation tests which are susceptible to being feigned, and that, consequently, plaintiff’s disability is manifested only by subjective symptoms. We are unimpressed by that contention. It is not likely Drs. Hatchette and Faludi would have been so easily deceived. Furthermore, the record discloses no indication of malingering, but on the contrary plaintiff has demonstrated his sincerity by, first, voluntarily subjecting himself to the extremely painful procedure incident to a myelogram test, and secondly, by undergoing a major surgical operation, the severity of which is as great as though positive for ruptured discs. We see no reason to discredit . the medical opinion advanced in plaintiff’s favor, and conclude that the preponderance of medical testimony supports the lower court’s finding that Blunt was totally and permanently disabled. On another occasion we made the following observation:
“Whether or not plaintiff was suffering from a herniated disc or a sacroiliac strain we do not feel called upon to decide. Nor does plaintiff have to show the exact nature of his disability under the Workmen’s Compensation Act, LSA-R.S. 23:1021 et seq., so long as it is reasonably apparent that he is suffering from such disability that he cannot perform his usual duties.” Wallace v. Spohrer-Pollard Contractors, La.App. 2 Cir., 1954, 76 So.2d 312, 314.
The principal controversy raised by counsel herein relates to plaintiff’s employment status, to-wit: whether the injured employee was loaned by Lunsford to Tri-State Oil Tool Company during that period in which Max Westbrook, the representative *383 of Tri-State was engaged in the special task of removing stuck drill pipe. If so, the latter must be held responsible for the employment injuries received by plaintiff.
The broad principle of law governing the doctrine of loaned or borrowed employees is aptly stated in Standard Oil Company v. Anderson, 1909, 212 U.S. 215, 218, 222, 29 S.Ct. 252, 253, 53 L.Ed. 480, in the following language:
“One may be in the general service of another, and, nevertheless, with respect to particular work, may be transferred, with his own consent or acquiescence, to the service of a third person, so that he becomes the servant of that person, with all the legal consequences of the new relation. * * * It sometimes happens that one wishes a certain work to be done for his benefit, and neither has persons in his employ who can do it nor is willing to take such persons into his general service. He may then enter into an agreement with another. If that other furnishes him with men to do the work, and places them under his exclusive control in the performance of it, those men become pro hac vice the servants of him to whom they are furnished. But, on the other hand, one may prefer to enter into an agreement with another that that other, for a consideration, shall himself perform the work through servants of his own selection, retaining the direction and control of them. In the first case, he to whom the workmen are furnished is responsible for their negligence in the conduct of the work, because the work is his work and they are, for the time, his workmen. In the second case, he who agrees to furnish the completed work through servants over whom he retains control is responsible for their negligence in the conduct of it, because, though it is done for the ultimate benefit of the other, it is still, in its doing, his own work. To determine whether a given case falls within the one class or the other we must inquire whose is the work being performed, — a question which is usually answered by ascertaining who has the power to control and direct the servants in the performance of their work.” See also, the annotations at 1 A.L.R.2d 303; 17 A.L.R.2d 1388; 39 C.J. 558, Section 669; 56 C.J.S. verbo Master and Servant § 330, p. 1093.
Our jurisprudence is replete with references to a “Whose Business Test” and a “Right of Control Test”, each of which has been termed decisive as to the applicability of the borrowed employee doctrine. In reality these tests are one and the same, for, as indicated in the above quotation, determining who controls the servant is merely a means of determining in whose business the servant is engaged. Benoit v. Hunt Tool Company, 1951, 219 La. 380, 53 So.2d 137. The author of the Benoit opinion, Judge Hawthorne, elaborated on the right of control criteria as follows:
“It has been pointed out that in applying the latter test it is often difficult to decide just what fact or facts constitute control. Mere division of control does not, in itself, raise the presumption of surrender of control, but there is a presumption that the general employer is liable, and it rests upon him to show that, as to the particular work in question, the servant has been lent and is performing only the borrower’s work, and that he was not the defendant’s servant at all.” Id., 219 La. at page 140, 53 So.2d at page 140.
A similar qualification was set forth in the aforecited United States Supreme Court case wherein the following observation was made with reference to right of control:
“Here we must carefully distinguish between authoritative direction and control, and mere suggestion as to details or the necessary cooperation, where the work furnished is part of a larger undertaking.” Standard Oil *384 Company v. Anderson, supra. (Emphasis supplied.)
This language has been quoted with approval by Louisiana courts in Benoit v. Hunt Tool Company, 1951, 219 La. 380, 53 So.2d 137, 141; Humphreys v. Marquette Casualty Company, 1958, 235 La. 355, 103 So.2d 895, 900; Stafford v. Gilmer, La. App. 2 Cir., 1957, 98 So.2d 522.
In Stafford v. Gilmer, supra, this court sought to determine the status of an orderly of the North Louisiana Sanitarium, Inc., who, following orders of the night supervisor, went to the neighboring Gilmer Hospital for the purpose of lifting a heavy patient who had fallen, and in so doing injured himself. The following comments appear in our opinion:
“We think it is obvious that the task performed by Stafford was relatively a simple one, and supervision or instruction by the agents or employees of Dr. Gilmer in the performance of the particular task would at best be in the nature of cooperation rather than control. Stafford’s regular employment being that of an orderly, undoubtedly encompasses similar duties for his employer, the North Louisiana Sanitarium, Inc., and probably accounts for his own supervisors directing him to go next door to the Gilmer Hospital. Such a departure from his regular place of work apparently was not a departure from his customary duties. The service so performed at Gilmer Hospital in its relation to the contract of employment was of minor consequence and under such circumstances Stafford’s regular employer would not have been inclined to relinquish his usual control and supervision over Stafford.” Id., at page 525.
“We conclude that Stafford did not depart from his regular employment when requested to perform a duty such as he daily was accustomed to perform, although to accomplish it he was directed to go to a hospital adjoining that of his employer. Under the circumstances related in the petition we are quite certain there was no intention on the part of either Stafford or his regular employer to relinquish to the defendant, Dr. Gilmer, the right to supervise and control Stafford’s employment.” Id., at pages 526-527.
We have experienced no great difficulty in arriving at the conclusion that Blunt was not a borrowed employee of Tri-State. The testimony of Tri-State Oil Tool Company representatives, G. H. Burn-ham and Max Westbrook, plainly discloses that Blunt was not a borrowed employee of that organization. Westbrook’s standing instructions were to subordinate himself to the orders of the customer when called upon a job, and, consequently, the tool pusher or his superior retained general supervision of the rig and drilling crew. In the instant situation Lunsford, upon learning that his drill pipe had become stuck, telephoned the Tri-State warehouse manager, who, after ascertaining the depth of the well, had the necessary supplies loaded on its truck and directed Westbrook to go to the job and attempt to remove the pipe or “fish” from the hole. The arrangements between Tri-State and Luns-ford called for a per diem rental of the specialized tools and a rate of $45 per day for the services of Westbrook who was highly trained in the use of said tools. Tri-State supplied only the tools and West-brook’s services, it being necessary that Lunsford’s drilling crew perform all services in connection with the operation of the rig other than such as might be performed by Westbrook alone. The latter explained that when advisable he assumed the function of a member of the drilling crew, subject always to the consent and approval of the tool pusljer who was boss of the rig. Accordingly, herein Westbrook assumed the work of the driller and operated the draw works. L. V. Young, the tool pusher, remained in the vicinity and was regarded by Westbrook as having retained complete control of the drilling crew. *385 Young testified that he retained such authority and that had he seen fit to do so for the protection of his operations, he could have discharged Westbrook. Moreover, the nature of plaintiff’s duties was affected minutely, if at all, by reason of Westbrook’s presence. Use of the specialized tools necessitated only minor adjustments from a roughneck’s normal routine. Blunt’s wages, hours and other incidents of employment remained undisturbed. We find under these circumstances that Blunt’s employment status and working conditions were not substantially changed, and that he was in no sense of the word a borrowed employee of Tri-State.
We are referred to the Supreme Court’s thorough examination of the borrowed servant doctrine in Humphreys v. Marquette Casualty Company, 1958, 235 La. 355, 103 So.2d 895, wherein the general and special employers were held solidarily liable. We do not consider the ruling in the Humphreys case inconsistent with our instant holding forasmuch as the special employer therein was vested with complete control over the employees, even as to hours, duties, methods of work, and privilege of discharge. Furthermore, the employees’ duties with reference to the special work involved in the Humphreys case were distinct and unconnected with those normally encountered in their general employment. It was pointed out:
“The principal upon which the regular employer is held is the same in each instance, i. e., that the special service of the employee, being performed at his principal’s request, is service arising out of his employment. Hence, the circumstance that the special employer is likewise liable for compensation affords no basis for relieving the regular employer from liability for compensation imposed by the law in virtue of the hiring contract. Indeed, it is the good fortune of the regular employer that the special employer is likewise liable and able to respond, thus contributing in part to his liability for the entire compensation due.” Id., 103 So.2d at page 907.
It is our finding that as a result of the accident, plaintiff is totally and permanently disabled and as such, he is entitled to recover workmen’s compensation against H. G. Lunsford and the latter’s insurer, the National Automobile & Casualty Insurance Company. We further find that Blunt was not a borrowed employee of the Tri-State Oil Tool Company, Inc., and for this reason plaintiff’s demands against said company and its insurer are also denied. Likewise, the demands of H. G. Lunsford and the National Automobile & Casualty Insurance Company against Tri-State Oil Tool Company, Inc. are rejected. Accordingly, the judgment from which appealed is affirmed, all costs of this suit to be paid by H. G. Lunsford and National Automobile & Casualty Insurance Company.